In the Matter of the Application of NEW YORK STATE ELECTRIC AND GAS CORPORATION and Others, Petitioners, for a Certiorari Order against PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK (State Division, Department of Public Service of the State of New York), and MILO R. MALTBIE and Others, as Public Service Commissioners of the State of New York, Respondents.

Third Department, June 27, 1935.

*Travis, Brownback & Paxson* and *E. B. Naylon* [*Warnick J. Kernan, Gerald J. Dean* and *Jesse J. Holland* of counsel], for the petitioners.

*Charles G. Blakeslee* [*John T. Ryan* and *John J. Donohue* with him on the brief], for the respondents.

McNAMEE, J.  The order complained of was made by the Public Service Commission on the 22d day of June, 1932, in a proceeding initiated on its motion, for the purpose of inquiring into the rules, the regulations and practices, the accounts and records of the petitioners, and certain other public service corporations; and also for an inquiry into the relations existing between said corporations and other persons and corporations having affiliate interests with them, and also the influence exerted over the policies and conduct of such corporations by such affiliates.  The order was made after notice given to the petitioners and after the holding of several hearings.  A large quantity of evidence was introduced by the Commission; but the petitioners declined to offer any proof, on the theory that the Commission was without jurisdiction, and that they intended to review any order that might be made in the proceeding.

The Commission concluded after such hearings and upon the evidence that improper relations existed and that improper practices were carried on between the petitioners and nine other business corporations and associations affiliated with the petitioners, viz., W. S. Barstow & Co., Utility Management Corporation, Utilities Purchasing and Supply Corporation, Public Utilities Appliance Corporation, H. C. Hopson & Co., Daniel Starch and Staff, Mid-State Fuel Corporation, Utility Clearing Corporation and Associated Gas and Electric Company; that such improper relations and practices arose out of the execution between them of certain service contracts, so called, and understandings, and the payment by the petitioners to said affiliates of large sums of money, and the improper entry of such payments in the books of the petitioners.

By its order the Commission directed the petitioners (1) to make no further payments to said affiliates, and to make no further charges in its accounts of fixed capital and operating expenses on account of payments made to said affiliates, unless such charges were entered in the account of profit and loss, to be borne directly and solely by the stockholders of the petitioners; and (2) to make

no amendment or extension of any existing service contract with said affiliates until such amendment or extension had been approved by the Commission.

Of the nine so-called service contracts or understandings, three will be adequate to indicate the general nature and purport thereof. These contracts appear on their face to have been made by the New York State Operating Utilities, as employer, with the affiliates. One was made with the J. G. White Management Corporation, a Connecticut corporation, according to which the latter was to supervise and direct the management and operation of properties for a period of ten years, and to be paid for such service two and one-half per cent of the gross annual earnings; another was made with W. S. Barstow & Co., a Delaware corporation, according to which the latter was to supervise and direct construction and improvements, and the acquisition of extensions, for a period of ten years, in consideration of the payment of seven and one-half per cent of the gross amount charged or chargeable since July 1, 1929, to the plant or property accounts; and another was made with the Utilities Purchasing and Supply Corporation, a Delaware corporation, according to which the latter was to purchase or supervise the purchase of apparatus and material, and to supervise the shipping transportation, delivery inspection and distribution of purchases, for a period of ten years, in the consideration of the payment of one and one-half per cent of the amount paid for such purchases. In each of these written contracts there are provisions relative to the giving of advice, and keeping informed of the needs of the employer, supervising the preparation of statistics, and supervising the placing of insurance and many other things similar and dissimilar; but their purport in the main is indicated.

During the years of 1930 and 1931 there were paid to these nine affiliates respectively from the earnings of these petitioners varying amounts ranging from about $123,000 to more than $2,000,000, and in the aggregate more than $7,700,000. Three of these companies received by way of expenses more than $421,000. And although there is nothing in the record to definitely indicate what is the function of the Associated Gas and Electric System, or what, if any, written contract was made therewith, yet these petitioners were required to pay from their earnings to this " System " during the same period more than $1,200,000.

On September 3, 1931, the Commission sought, by letter addressed to the petitioners, to procure such information, from the books of the petitioners, as would reflect the actual transactions of the petitioners with these affiliates. This information was required to be furnished on or before October 1, 1931, but the information

was not provided. And upon the hearings the petitioners declined to offer any proof that the payments thus made and charged to capital or operating expenses were correct, or that any services were rendered therefor. The record before us indicates unusual and intricate interlocking of these petitioners and affiliated companies, through the persons who constituted the executive officers and directors of the respective companies. And it is not possible to escape the view, clearly reflected by the record, that the affiliated companies which received these large payments were controlled by the same persons who controlled these petitioners; and the Commission was amply justified by the evidence in reaching that conclusion. And the Commission was further justified in its conclusion that the so-called service contracts were made by officers who were not free to secure contracts that were advantageous to the petitioners or in the public interest.

The petitioners make much of the allegation that the Commission is attempting to interfere in the management of these petitioner companies, and to remove the management from the hands of their respective boards of directors. We are unable to accept this view. The service contracts are a much stronger suggestion that the petitioners have to a large extent divested themselves of the management in favor of the affiliates. It is undoubtedly true that the petitioners are free to control the management of their respective companies as long as such management indicates that it is carried on for the benefit of the operating companies and in the public interest. But when it is made to appear that the public interest is unfavorably affected by a course of management adopted to evade the law, by furnishing a false basis for rates, and an unreasonable charge upon the public, the jurisdiction of the Commission at once attaches. It is the duty of the Commission to prevent the imposition upon the public of unfair rates, and the creation of a rate base which is not justified. Accordingly, the Commission has a duty to know how the company is managed, so that they may know that the law is being obeyed, and the rights of the public preserved. We do not understand the petitioners to contend that if money were illegally paid under these service contracts, unfavorably affecting the rights of the public, the Public Service Commission was powerless to interfere. We believe that such is a prime function of the Commission.

By the statute the Commission is given power to examine " the accounts, books, contracts, records, documents and papers " of a public utility, and after hearing " to prescribe by order the accounts in which particular outlays and receipts shall be entered, charged or credited." And upon any such hearing the burden

of proof is on the corporation to establish the correctness of the accounts in which such outlays have been entered, and the Commission "may suspend a charge or credit pending submission of proof" by the corporation (Public Service Law, § 66, subd. 9). Here the Public Service Commission has sought information to determine whether payments made under these service contracts were correct or not, and the petitioners have refused the information. They have not only failed to sustain the burden of proof, but they have offered no proof. And the court is not willing to reject the view of the Commission that these service contracts, on their face, do not purport to be in the public interest, or in the interest of the petitioners themselves. And in the circumstances shown by the record, in requiring the petitioners to enter payments made under the service contracts in the profit and loss account, the Commission neither exceeded its jurisdiction nor deprived the petitioners of a constitutional right. If the items in question do not properly belong to profit and loss, the petitioners alone are at fault; they declined to furnish information or the proof that would justify the Commission in ordering otherwise.

The petitioners contend that the Commission has attempted to interfere with and to disapprove the service contracts in question. The court does not entertain that view. The order contains no provision in any way invalidating or affecting the contracts in question, or their performance. It deals only with the bookkeeping that records transactions thereunder, and this because the petitioners have declined to divulge the correctness and the legality of the entries.

The paragraph marked "2" of the order prohibits the making of an amendment or extension of any existing service contract or agreement with the affiliates mentioned, until such amendment or extension shall have been submitted to and approved by the Commission. In this provision the Commission has departed from the intent expressed and the practice contemplated by the statute. Of course, an amendment or extension of a contract would be of necessity a new contract. The statute does not prohibit, nor authorize the Commission to prohibit, the "making" of a service contract with an affiliate. It provides only in so far as we are concerned, that such a contract shall not "be effective unless it shall first have been filed with the commission;" that no charge thereunder shall exceed the reasonable cost of performing such service; that in a proceeding to determine such reasonable cost, the burden of proof shall be upon the company; and if found upon hearing that such contract is not in the public interest, the Commission may disapprove the same (Public Service Law, § 110,

subd. 3). Until there has been an amendment or extension of such contract entered into and filed there is no basis for an inquiry into costs or the public interest thereunder. As to this provision we regard the order made as in excess of the jurisdiction of the Commission.

The record indicates that office clerks, meter readers, linemen and other employees of the respective petitioners have been required to devote their time to the selling of securities of companies other than the one by which they are employed, and that the expenses attendant upon such activity have been charged as an operating expense. The petitioners in their brief do not deny these facts, and admit that such employment is " a non-utility activity," but complain of the restriction. It is clear that it would be error to permit the enlargement of the payroll by wages, salaries or commissions for such work. It is precisely work of that character, which is not in the public interest, at the expense of the operating utility that is prohibited by the order. We do not regard this provision of the order as an impingement on the rights of the petitioners.

The determination under review, in so far as it prohibits, by paragraph thereof numbered " 2," the amendment or extension of any existing service contract or agreement, should be annulled and remitted for the making of such order as the statute permits, and that in all other respects the order should be confirmed.

HILL, P. J., RHODES, CRAPSER and HEFFERNAN, JJ., concur.

Determination modified by striking out the provision in paragraph marked " 2 " of the order which prohibits the amendment or extension of existing service contracts, and as so amended the order is confirmed.

Matter remitted for the making of such order as to amendment or extension of contracts, as the statute permits, as indicated in the opinion.