COUNTY OF SUFFOLK, a municipal corporation, Robert Alcorn, Christopher S. George, Fred Harrison, Peter Maniscalco, William P. Quinn, and Custom Extruders, Inc., Plaintiffs,

v.

LONG ISLAND LIGHTING COMPANY, Stone & Webster Engineering Company, Charles R. Pierce, Wilfred O. Uhl, Charles J. Davis, and Andrew W. Wofford, Defendants.

No. 87–CV–646 (JBW).

United States District Court, E.D. New York.

Feb. 11, 1989.

As Amended April 14, 1989.

James W. Johnson and Lawrence P. Kolker, New York City, E. Thomas Boyle, County Atty. of Suffolk County, Hauppauge, N.Y., and Kirkpatrick & Lockhart by Lawrence Coe Lanpher and Karla Letsche, Washington, D.C., for plaintiff Suffolk County.

Vladeck, Waldman, Elias & Engelhard by Judith P. Vladeck, Karen Honeycutt and Julian Birnbaum, New York City, for Individual Ratepayer plaintiffs.

Bower & Gardner by James D. Harmon, Jr. and Michael Eng, New York City, for U.S.

Farrell, Fritz, Caemmerer, Cleary, Barnosky & Armentano by George J. Farrell and Delores Freidrich, Uniondale, N.Y., and Edward T. O'Brien, County Atty. of Nassau County, Mineola, N.Y., for Proposed intervenor County of Nassau.

Peter L. Zimroth, Corp. Counsel of City of New York (Peter Lehner, of counsel), New York City, for Proposed intervenor City of New York.

Reilly, Like & Schneider by Irving Like, Babylon, N.Y., and Flower & Plotka, by Edward Flower, Bay Shore, N.Y., for plaintiff Custom Extruders, Inc. and Proposed intervenors Business Ratepayer plaintiffs.

Marilyn A. Marlek, Bethpage, N.Y., for Proposed intervenor Grumman Corp.

Leibowitz & Peterson by Ira Leibowitz, Garden City, N.Y., for Proposed intervenor Long Island Ass'n.

Lewis & Greer by Lou Lewis, Poughkeepsie, N.Y., for Proposed intervenor Shoreham–Wading River Cent. School Dist.

Shea & Gould by Michael Lesch, Ronald H. Alenstein and John G. Nicolich, New York City, for the Individual defendants.

Susan E. Silverman, Hicksville, N.Y., for defendant Long Island Lighting Co.

Mudge Rose Guthrie Alexander & Ferdon by Laurence V. Senn, Jr., New York City, for defendant Stone & Webster Engineering.

Robert Abrams, New York City, New York State Atty. General's Office, New York City.

Hill, Betts & Nash by Bernard Persky, Kenneth F. McCallion, Gregory W. O'Neill,

## AMENDED MEMORANDUM AND ORDER

## APPLICATION OF RICO

WEINSTEIN, District Judge:

### TABLE OF CONTENTS

I. PROCEDURAL BACKGROUND
II. EQUITABLE DEFENSE AND FIRST AMENDMENT
III. SUFFOLK COUNTY'S CLAIMS
   A. *Motions for Judgment Notwithstanding the Verdict and a New Trial*
     1. Sufficiency of the Evidence
     2. Res Judicata
     3. Primary Jurisdiction
   B. *Application of RICO*
     1. Primary Jurisdiction
     2. Abstention
     3. "Our Federalism"
     4. Doctrine of Clear Statement
IV. CONCLUSION

## I. PROCEDURAL BACKGROUND

Suffolk County alleges that the Long Island Lighting Company (LILCO) and its former managers have repeatedly lied to the New York Public Service Commission (PSC) in order to obtain the higher electric rates needed to build the Shoreham Nuclear Power Facility (Shoreham). It brings this suit under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.*

The uncertainties raised by this litigation have compounded the serious economic and energy problems facing millions of people in New York City, Nassau and Suffolk Counties. The welfare of Long Island residents is threatened by doubts about LILCO's continued capacity to supply necessary electric power at affordable rates.

Suffolk, with five individuals and one business corporation, originally brought this suit as a class action on behalf of itself and a class of over one million present and former LILCO ratepayers. Because of Suffolk's longstanding opposition to the opening of Shoreham and its entanglement with LILCO in various other pending litigations, Suffolk and its attorneys could not adequately represent the interests of the class. *See* 710 F.Supp. 1405 (E.D.N.Y. 1988). Suffolk's claims were severed from those of the class for the purposes of the impending trial.

After an extensive jury trial, Suffolk obtained a verdict in its favor on some of its RICO claims. It was awarded damages by the jury which, when trebled as is required under the RICO statute, totaled some 22.9 million dollars. Following the verdict, LILCO moved for trial of a previously severed equitable defense to Suffolk's claims. That defense is dismissed for the reasons described below in Part II.

LILCO has also moved for judgment notwithstanding the verdict or in the alternative a new trial. The motion for judgment notwithstanding the verdict is granted, and the new trial motion is conditionally denied, for the reasons stated below in Part III.

## II. EQUITABLE DEFENSE AND FIRST AMENDMENT

LILCO claims that Suffolk's unremitting opposition to the opening of Shoreham has caused far more damage to LILCO than the jury found Suffolk had suffered because of LILCO's alleged fraud on the PSC. This equitable defense is triable without a jury. The court has now heard the witnesses and received documents bearing on this issue. It makes the following findings:

After many years of encouraging LILCO to build Shoreham to reduce Long Island's total dependence on foreign oil for its power and to take advantage of lower costs for nuclear fuel, Suffolk reversed its policy. Beginning in the early 1980's it became an implacable foe of Shoreham. At the local, state and national levels it has successfully fought to prevent Shoreham from producing the 800 megawatts the plant has been capable of generating. In addition to advocacy before the state legislature and state and federal administrative bodies, Suffolk's refusal to cooperate in providing emergency procedures for dealing with a possible nuclear accident has blocked LILCO from using Shoreham.

Suffolk's opposition to Shoreham was based on a bona fide concern for, and by, its residents over the safety of the plant. Similar good faith misgivings over the hazards of nuclear power on Long Island have motivated the Governor and various state departments and legislators to seek Shoreham's closing.

The evidence demonstrated that, had Suffolk and the state cooperated with LILCO, Shoreham would now be in operation and LILCO and its shareholders (and possibly its ratepayers) would be in a more favorable economic position. The cost to LILCO and others of Suffolk's and the state's change of views regarding Shoreham cannot be precisely measured. It can reasonably be estimated as at least in the hundreds of millions of dollars.

■ Nevertheless, the equitable defense must be dismissed. Suffolk had, and has, a constitutional right under the First Amendment to speak and act in opposition to Shoreham. Its view that Shoreham represents a danger to Suffolk residents may be expressed in exercising its power to petition any agency of government including the legislature, administrative agencies and the courts. It can, if it wishes, enact its own local legislation and exercise its own police powers when expressing its policy so long as its action is in conformity with state and federal limitations. No proof of a violation of any state or federal limits on Suffolk's power has been shown.

■ A municipal corporation, like any corporation, is protected under the First Amendment in the same manner as an individual. *See First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 776–84, 98 S.Ct. 1407, 1415–20, 55 L.Ed.2d 707 (1978). The right to petition administrative agencies is a basic First Amendment right. *See, e.g., California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972); *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Bd. of Culinary Workers,* 542 F.2d 1076 (9th Cir.1976), *cert. denied,* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977).

■ It follows that plaintiff's activities before the United States Nuclear Regulatory Commission (NRC) are privileged against claims by defendants that Suffolk improperly delayed the Shoreham licensing proceedings. *See, e.g., Eastern R.R. Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 615 (8th Cir.1980). The *Noerr–Pennington* doctrine, protecting the right of a party to oppose its adversaries before administrative agencies, is applicable. *See, e.g., Southern Pac. Communications Co. v. American Tel. and Tel. Co.,* 556 F.Supp. 825, 881 (D.D.C.1982), *aff'd,* 740 F.2d 980 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985). No damages may be recovered that arise from Suffolk's exercise of its constitutional right to oppose Shoreham's operation.

Suffolk's right has already been recognized in related litigation involving Shoreham. In 1984 LILCO was granted leave to intervene as a plaintiff in a federal suit filed by a not-for-profit corporation, and five of its members, against Suffolk. *Citizens For An Orderly Energy Policy, Inc. v. County of Suffolk,* 604 F.Supp. 1084, 1087–88 (E.D.N.Y.1985), *aff'd,* 813 F.2d 570 (2d Cir.1987). LILCO alleged that Suffolk's lack of participation in emergency evacuation planning "may result in a denial of an operating license for Shoreham and spell financial doom and bankruptcy for the company." 604 F.Supp. at 1087. The district court dismissed LILCO's claim for damages, noting that

> the NRC alone has the power to decide whether the license will be granted. [Suffolk's] actions in seeking to influence the NRC's decision are not in and of themselves an unlawful interference with the licensing process.

*Id.,* 604 F.Supp. at 1096. The Second Circuit affirmed. 813 F.2d 570 (2d Cir.1987).

LILCO may possibly have a claim for breach of contract against Suffolk because of the latter's alleged failure to comply with an agreement to cooperate in evacuation procedures. That issue is being litigat-

ed in a pending state case. All pendent and related state claims were dismissed in this RICO action.

Suffolk's motion to dismiss LILCO's equitable defense is granted.

## III. SUFFOLK COUNTY'S CLAIMS

### A. *Motions for Judgment Notwithstanding the Verdict and a New Trial*

LILCO has moved to dismiss the complaint notwithstanding the verdict of the jury. It moves in the alternative for a new trial. Various factual and legal grounds are advanced by LILCO in support of its motions.

#### 1. Sufficiency of the Evidence

LILCO challenges a number of the jury's factual determinations. It claims no reasonable jury could have concluded that defendants had the requisite intent to defraud. It argues that defendants' alleged misrepresentations could not have caused any injury to Suffolk because the PSC did not rely on the alleged misrepresentations in deciding to grant rate increases, there was no evidence that the rates paid by Suffolk would have been lower absent the alleged fraud, and the ratemaking techniques employed by the PSC, even if influenced by the defendants' alleged fraud, will ultimately provide an aggregate benefit to ratepayers, including Suffolk. LILCO also asserts that the evidence shows the County's claim with regard to the 1977–78 rate case was barred by the statute of limitations and that the evidence failed to establish the elements of a RICO claim.

■ Deference to the jury's conclusions is required by the Seventh Amendment to the Constitution, guaranteeing the right to a jury trial. Here the jury apparently followed the court's instructions. The jury's verdict was supportable on its view of the facts and the credibility of the witnesses.

In many respects the court does not disagree with the jury's determinations. There was sufficient evidence to support the conclusion that defendants' alleged misrepresentations have injured Suffolk. The jury was not unreasonable in deciding that

Suffolk neither knew nor should have known of the defendants' alleged fraud in the 1977–78 rate case prior to the four year limitations period that governs RICO claims. *See Agency Holding Corp. v. Malley–Duff & Assoc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir.1988). Nor can it be said the evidence failed to establish the elements of a RICO claim. In this regard it should be noted that, with the hindsight provided by the Second Circuit's recent *en banc* decisions in *United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989), and *Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir.1989), decided after the verdict here, this court's charge to the jury concerning the elements of a RICO violation was, if anything, overly favorable to LILCO.

The court does not agree with the jury's conclusion that the defendants intended to commit fraud. The court's conclusion is that LILCO's estimates of the time needed to complete Shoreham were made in good faith, but based on misplaced optimism, lack of nuclear experience and events beyond its control. After the plant was begun, Three Mile Island and other nuclear events caused the NRC to substantially increase the safety requirements for nuclear plants. These stringent new protections required huge new expenditures of money and time. The breakdown of Shoreham's emergency diesel generators and other impediments to operation seem less the result of fraud than of incompetence and inexperience on the part of LILCO and its subcontractors. LILCO appears to the court to have made managerial judgments which, in retrospect, were unsound, but no fraud seems to have been intended.

Nonetheless, while the evidence of fraud by LILCO and those associated with it seemed to the court to be insubstantial and unconvincing, this is an insufficient basis on which to set aside the verdict and grant judgment for defendants pursuant to Rule 50(b). The jury was entitled to its own view, and LILCO bears a heavy burden in its motion for judgment notwithstanding the verdict. The motion for judgment

NOV may be granted "only if the evidence, viewed in the light most favorable to [Suffolk] without considering credibility or weight, reasonably permits only a conclusion in [LILCO's] favor." *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 (2d Cir.), *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982) (citing cases). Here that burden has not been met. Despite the court's view of the evidence, it cannot be said that the jury was unreasonable in taking a contrary view. Thus the motion to set aside the verdict for a failure of proof must be denied.

Although the standard for granting a new trial for a failure of proof is less stringent than that for judgment NOV under Rule 50 of the Federal Rules of Civil Procedure, "[i]t is well settled that a trial judge's disagreement with the jury's verdict is not sufficient reason to grant a new trial." *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir.1983) (citing cases). Even when the trial judge has "character-iz[ed] the evidence against [the prevailing party] as 'overwhelming'" and the evidence in favor as "'extremely thin and tenuous,'" there is no requirement that a new trial be granted. *Compton v. Luckenbach Overseas Corp.*, 425 F.2d 1130, 1133 (2d Cir.), *cert. denied*, 400 U.S. 916, 91 S.Ct. 175, 27 L.Ed.2d 155 (1970). Rather, a new trial is warranted only when "it is quite clear that the jury has reached a seriously erroneous result" or for other reasons there has been a "miscarriage of justice." *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978). While the court does not share the jury's view that fraud was intended, it cannot be said the jury's determination is "seriously erroneous" or there has been a "miscarriage of justice." Thus LILCO's motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure on the grounds of a failure of proof must be denied as well.

The same considerations as warrant denial of a new trial lead the court to deny a conditional retrial pursuant to Rule 50(c)(1) of the Federal Rules of Civil Procedure. As indicated below in Part III B., a motion for judgment notwithstanding the verdict is being granted pursuant to Rule 50(b) of the Federal Rules of Civil Procedure since the case is being dismissed. In general, new trials after appeal should be avoided where there has been no miscarriage of justice. *See* 9 C. Wright, A. Miller & E. Kane, Federal Practice & Procedure: Civil § 2539, n. 75 (1971).

### 2. Res Judicata

LILCO also argues that the verdict should be set aside because the doctrine of res judicata bars Suffolk's RICO claims in this case. There are two prior actions upon which LILCO relies. The first is the Shoreham Prudence Proceeding, which was conducted by the PSC from 1979 to 1985 to determine whether the costs of building Shoreham were prudently incurred. Suffolk was an intervenor against LILCO in that proceeding. The second is a suit brought against LILCO by Suffolk in state court in 1982 challenging various aspects of the Shoreham construction. The suit was removed to federal court and subsequently the County's claims were dismissed on jurisdictional grounds. *County of Suffolk v. Long Island Lighting Co.*, 554 F.Supp. 399 (E.D.N.Y.1983), *aff'd*, 728 F.2d 52 (2d Cir.1984). LILCO contends that Suffolk's RICO claims are barred by res judicata because they arise out of the same transaction or series of transactions that were the subject of these prior proceedings, relying upon *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 445 N.Y.S.2d 687, 429 N.E.2d 1158 (1981).

LILCO's argument is not persuasive. *O'Brien* is not applicable. Res judicata does not apply if the prior adjudicatory body lacked subject matter jurisdiction over the claims asserted in the later action. *See Cullen v. Margiotta*, 811 F.2d 698 (2d Cir.), *aff'd sub nom. Nassau County Republican Comm. v. Cullen*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987) (citing cases and authorities, and holding that prior state proceeding was no bar to later assertion of RICO claim in federal court). Although it has recently been held that New York courts may entertain RICO claims, *Simpson Elec. Corp. v. Leucadia, Inc.*, 72 N.Y.2d 450, 534 N.Y.S.2d 152, 530

N.E.2d 860 (1988), the PSC has no jurisdiction to try a RICO claim as such, although it may consider the fraud of a public utility in setting rates. *See* N.Y. Public Service Law §§ 5, 22, 66(5) and (12), 71, and 72 (prescribing powers of PSC); *City of New York v. New York Pub. Serv. Comm'n*, 53 A.D.2d 164, 385 N.Y.S.2d 634, 635 (3d Dep't 1976), *aff'd*, 42 N.Y.2d 916, 397 N.Y.S.2d 1005, 366 N.E.2d 1359 (1977) (PSC has only those powers conferred to it by statute); authorities cited infra at section III B. No findings with respect to fraud were made in the Shoreham Prudence Proceedings. They cannot act as a bar to Suffolk's claims in this litigation. Moreover, the jury concluded that LILCO committed fraud in a Shoreham Prudence Proceeding itself. Res judicata does not apply to judgments obtained by fraud. *Commissioner of Internal Revenue Service v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948); *McCarty v. First of Georgia Ins.*, 713 F.2d 609, 612–13 (10th Cir.1983); *see also* Restatement (2d) of Judgments § 26 comment j (1982).

As for the prior action in federal court, Suffolk's various state common law claims, upon which that action was based, were dismissed on procedural grounds rather than on the merits on January 14, 1983. Here the jury determined that Suffolk neither knew nor should have known of LILCO's alleged frauds prior to March 3, 1983. Moreover, the jury concluded that LILCO had committed fraud during the 1983–84 rate case and again in the Shoreham Prudence Proceeding in 1984. These frauds, if they existed at all, formed part of the "pattern of racketeering activity" found by the jury, *see* 18 U.S.C. § 1961(5), but occurred after Suffolk's earlier suit against LILCO had been dismissed. In such circumstances it cannot be argued that because of Suffolk's failure to bring a RICO claim against LILCO in the 1982 action, res judicata operates to bar the assertion of a RICO claim in this action. *Cf. Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 326–28, 75 S.Ct. 865, 867–68, 99 L.Ed. 1122 (1955) (although plaintiff's antitrust claims in an earlier suit were dismissed, res judicata did not bar later antitrust action "based on essentially the same course of wrongful conduct" where new violations were alleged).

### 3. Primary Jurisdiction

Finally LILCO argues that Suffolk's RICO claims should be stayed or dismissed pursuant to the doctrine of primary jurisdiction. Under this doctrine, issues within the special expertise of an administrative agency should be decided by the agency rather than a court. The doctrine is discussed at length in the following section of this memorandum. In light of the conclusion that RICO does not apply to this case, the court need not decide whether the primary jurisdiction doctrine, by itself, is a sufficient basis for a stay or dismissal of this action.

For the foregoing reasons, LILCO's motions for a new trial are denied.

### B. *Application of RICO*

This does not end the matter. After trial the defendant may move for what amounts to delayed summary judgment in the form of a motion for judgment notwithstanding the verdict. Rule 50, Federal Rules of Civil Procedure; *DeRosa v. Remington Arms Co.*, 509 F.Supp. 762 (E.D.N.Y.1981).

Prior to the trial the court, based on RICO precedent, was of the view that the federal RICO statute took precedence over state rate-regulating policy. What the trial proved almost beyond peradventure was that RICO cannot, and should not, be applied in a case such as this to permit a federal jury in a civil case to second guess the ratemaking authority of the state. In effect, the jury was asked to retroactively reset the electric rates previously fixed by the PSC with its staff of hundreds of technicians working in such arcane fields as utility ratemaking, marketing of utility securities, taxation, economics, generating plant construction, and power grids. PSC decisions affect generating capacity needed to ensure a supply of power sufficient to meet peak demands and emergency breakdowns of equipment. The rates it sets affect not only the particular utilities be-

fore it but the welfare of the entire state's population because of interrelations between generators and financing resources all over the state, in surrounding states and in Canada.

The "major purpose" of the RICO statute was to help block the criminal predations of organized crime upon legitimate businesses. *United States v. Turkette,* 452 U.S. 576, 591, 101 S.Ct. 2524, 2532, 69 L.Ed.2d 246 (1981). With almost no legislative debate or comment, it was extended as an afterthought to civil cases to encourage private suits as a supplement to the efforts of federal law enforcement agencies. *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 507, 516–20, 105 S.Ct. 3275, 3295, 3300–02, 87 L.Ed.2d 346 (1985) (Marshall, J., dissenting) (describing legislative history of RICO's civil remedy provision, 18 U.S.C. § 1964(c)). *See also* D. Smith and T. Reed, Civil Rico, ¶ 1.01 (1987). The great breadth of its predicate offenses, principally mail and wire fraud, has permitted the statute in its civil aspects to be broadly construed to cover a wide variety of fraudulent schemes. *Sedima,* 473 U.S. at 500, 105 S.Ct. at 3287. *See, e.g., Beauford v. Helmsley,* 865 F.2d 1386 (2d Cir.1989) (applying RICO to alleged fraudulent condominium apartment conversion scheme); *Haroco v. American Nat'l Bank & Trust Co. of Chicago,* 747 F.2d 384 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed. 2d 437 (1985) (RICO claim stated where bank alleged to have charged interest rates in excess of loan agreement). As a result, the Supreme Court has recognized that RICO is "evolving into something quite different from the original conception of its enactors." *Sedima,* 473 U.S. at 500, 105 S.Ct. at 3287.

That Congress has the power under the Necessary and Proper, the Supremacy and the Interstate Commerce clauses of the Constitution to impinge on states' powers to regulate utilities is assumed. And that Congress was aware of fears the RICO statute might alter the federal-state balance in some respects is apparent. *United States v. Turkette,* 452 U.S. 576, 586–87, 101 S.Ct. 2524, 2530–31, 69 L.Ed.2d 246 (1981). Nevertheless, no case, no language

of the statute and no congressional finding has demonstrated that Congress and the President intended to overturn all federal doctrine and jurisprudence in federalizing the law of torts under RICO. *Sedima,* 473 U.S. at 507, 105 S.Ct. at 3295 (Marshall, J., dissenting). As Professors Hart and Wechsler have observed:

> federal legislation, on the whole, has been conceived and drafted on an ad hoc basis to accomplish limited objectives. It builds upon legal relationships established by the states, altering or supplanting them only so far as necessary for the special purpose. Congress acts, in short, against the background of the total corpus juris of the states in much the way that a state legislature acts against the background of the common law, assumed to govern unless changed by legislation.

Hart and Wechsler's The Federal Courts and the Federal System 470–71 (P. Bator, P. Mishkin, D. Shapiro, H. Wechsler eds., 2d ed. 1973). *Cf. Fort Wayne Books v. Indiana,* —— U.S. ——, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989) (application of RICO limited by First Amendment to the Constitution).

That Congress intended to destroy a balance between state and national roles developed over more than two hundred years under the constitutional guarantee to the states of a Republican Form of Government and the Ninth, Tenth and Eleventh Amendments seems highly doubtful. The Constitution itself in section 4 of Article IV "guarantee[s] to every State in this Union a Republican Form of Government"—and the word government implies the powers to govern independently, not merely as an appendage of Washington. The Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, [to the national government], shall not be construed to deny or disparage others retained by the people [and their representatives in state government]." The Tenth Amendment notes that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." And the Eleventh Amend-

ment limits the national courts' power—and indirectly that of Congress—to "extend" the "Judicial power of the United States ... to any suit ... prosecuted against one of the United States" by enumerated plaintiffs.

The Constitution was adopted by sovereign nations first joined in a confederation and, after adoption, in a federal system of national and state sovereignties. Much of our early court "decisions can be seen as the replacement of the idea that the Constitution was created by a compact among the states with the idea that the Constitution created a union of the states." G.E. White, III & IV History of the Supreme Court of the United States, The Marshall Court and Cultural Change, 1815–35, 487 (1988). Despite exercise of increasing power by the national government no one who understands state government and our federal political system can doubt that the states are still powerful sovereignties respected as such by all three branches of the national government. This knowledge permeates the very bones of our political system. Congress need not explicitly recognize this given in each law it passes, for all its work is pregnant with that understanding. In construing legislation the courts can assume not only that those in Congress breathed when they voted, but that they were aware of the constitutional atmosphere in which their votes were cast.

With this fundamental assumption of our governmental structure in mind we turn to the relationship between federal and state power in the field of state regulation of utilities. That relationship is reflected in such diverse doctrines as those of primary jurisdiction, recognizing that state regulatory agencies should decide electric rates; of abstention to avoid upsetting complex regulatory schemes; and of limits on federal court powers to compel state officials and bodies to have their decisions judged in federal courts.

### 1. Primary Jurisdiction

It has long been recognized that courts are ill-suited for resolving the numerous complex factual issues involved in setting rates for regulated industries. Courts presented with such questions have consistently deferred to the greater experience and expertise of the relevant regulatory agency. Pursuant to the doctrine of primary jurisdiction, courts stay or dismiss court proceedings pending resolution by the administrative agency of the issues within the latter's special competence.

> "Primary jurisdiction" ... comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body....

*United States v. Western Pac. Ry.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–165, 1 L.Ed.2d 126 (1956). The doctrine provides "[u]niformity and consistency in the regulation of business entrusted to a particular agency...." *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494–95, 96 L.Ed. 576 (1952). "Uniformity can be secured only if ... determination is left to the Commission." *Great N. Ry. v. Merchants Elevator Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922).

The doctrine of primary jurisdiction lends strong support to the notion that the RICO statute is inappropriately applied to the facts of this case. In reaching its verdict the jury was required to place itself in the shoes of the PSC, deciding for a fifteen year period what level of rates the PSC would have set but for certain alleged misrepresentations. It was compelled to attempt to understand numerous complex issues of rate regulation which arose in five rate proceedings, and three proceedings under § 149–b of the Public Service Law. The records in those proceedings contained thousands of pages of testimony and thousands of exhibits. The jury performed its task without the benefit of the PSC staff, without the expertise which the PSC has in rate matters, and without reading the testimony or the opinions at issue in the PSC proceedings.

Whatever doubt the court entertained before trial about the need to defer rate-related matters to the PSC was put to rest by

the evidence both sides had to present to the jury. The Public Service Commission members and chairpersons who made the rate decisions were required to testify. They had to tell the jury why they now thought they made the many decisions they did over two decades; how, in retrospect, they might or might not have been affected in their decisions individually or collectively by different circumstances; and what the effect of their decisions on the welfare of the public might have been if they had had the hindsight now available to the jury. Such delving into the mental processes of a decisionmaker is as repugnant to federal policy when a state administrative fact finding body is involved as when a jury is the fact finder. *See, e.g.,* Federal Rules of Evidence, Rule 606 (juror may not testify to "effect of anything upon ... juror's mind ... or concerning the juror's mental processes ...").

As the Court of Appeals noted in the context of the continuing dispute between Suffolk and LILCO, *County of Suffolk v. Long Island Lighting Co.,* 728 F.2d 52, 61 (2d Cir.1984):

> Ratemaking is part of the Commission's daily work. The Commissioners have a large staff of experts to assist them with the more difficult technical aspects of regulating public utilities. In contrast, courts—whether state or federal—are ill-equipped to set electric rates. Were this Court, for example, to grant appellant its requested relief, it might reduce LILCO's rate base below the level required for LILCO to "break even" and, as a result, drive the company into bankruptcy or out of business. Also, if different courts could set different rates for electric power there would be no uniformity; and the question would arise, what rates govern? To avoid this possibility of confusion New York State confided to the PSC exclusive jurisdiction over rates.

This court recognized in its charge, which is the law of the case, that "[t]o say that a fraud was successfully committed against the PSC resulting in damages is, for practical purposes, to retroactively reduce electric rates." Charge p. 18.

▮▮▮ The doctrine of primary jurisdiction applies even where a central issue is whether misrepresentations to an administrative agency resulted in rate increases. *See Alberta Gas Chem., Ltd. v. Celanese Corp.,* 650 F.2d 9, 12 (2d Cir.1981) ("central issue" of the action was alleged misrepresentations before the commission).

An argument can be made that the primary jurisdiction doctrine should not be applied by a federal court to a state administrative agency where that course of action will frustrate a federal policy. But there is no reason to believe that allowing the PSC to set state electric rates and to exercise its own powers to roll back rates where it has been misled will frustrate RICO policy. *See* N.Y. Public Service Law §§ 5, 22, 66(5) and (12), 71, and 72 (establishing PSC and describing its ratemaking authority and procedures for administrative review); *see also New York State Elec. & Gas Corp. v. Public Serv. Comm'n,* 245 A.D. 131, 135, 281 N.Y.S. 384, 387–88 (3d Dep't 1935), *aff'd,* 274 N.Y. 591, 10 N.E.2d 567 (1937) (PSC has jurisdiction where utility furnishes "false basis for rates" resulting in an unreasonable charge upon the public); *Alvarez v. Schwartz,* 130 Misc.2d 692, 694, 497 N.Y.S.2d 602, 604 (Sup.Ct.N.Y.Co.1985) (administrative agency may reopen decision tainted by fraud, citing *People ex rel. Finnegan v. McBride,* 226 N.Y. 252, 123 N.E. 374 (1919)).

The RICO statute does not inhibit application of the doctrine of deference. *See, e.g., H.J., Inc. v. Northwest Bell Tel. Co.,* 648 F.Supp. 419 (D.Minn.1986), *aff'd on other grounds,* 829 F.2d 648 (8th Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988) (applying the "filed rate doctrine" to dismiss a claim brought under the RICO statute alleging damages as a result of alleged improprieties committed in connection with proceedings of the Michigan Public Utilities Commission); *Meditech Int'l Co. v. Minigrip, Inc.,* 648 F.Supp. 1488, 1494–1495 (N.D.Ill.1986) (applying the holding in *Alberta* to a damages claim under RICO predicated upon alleged

fraud which allegedly resulted in the issuance of an order by the International Trade Commission banning the importation of certain plastic bags); *cf. Nike, Inc. v. Rubber Mfrs. Ass'n,* 509 F.Supp. 912, 917–918 (S.D.N.Y.1981) (staying an antitrust claim based upon the alleged provision of false certifications by defendants to the United States Customs Service that resulted in the imposition of special duties on Nike shoes).

Federal courts have applied the doctrine where the claim is brought under federal law and the regulatory agency is a state body. *See, e.g., H.J., Inc. v. Northwestern Bell Tel. Co.,* 648 F.Supp. 419 (D.Minn. 1986), *aff'd on other grounds,* 829 F.2d 648 (8th Cir.1987), *cert. granted,* — U.S. ——, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988) (federal RICO action); *Huron Valley Hospital v. City of Pontiac,* 666 F.2d 1029 (6th Cir.1981) (federal antitrust action); *Industrial Communications Sys. v. Pacific Tel. & Tel. Co.,* 505 F.2d 152 (9th Cir.1974) (federal antitrust action); *Litman v. A. Barton Hepburn Hospital,* [1982–83] Trade Cases (CCH) ¶ 65,161, 1983 WL 1780 (N.D.N.Y.1983) (federal antitrust action); *Denver v. Santa Barbara Community Dialysis Center,* [1981–1] Trade Cases (CCH) ¶ 63,946, 1981 WL 2051 (C.D.Cal. 1981) (federal antitrust action); *Association Tel. Answering Exchanges v. American Tel. & Tel. Co.,* 492 F.Supp. 921 (E.D. Pa.1980) (federal antitrust action).

### 2. Abstention

Inapplicability of RICO in this case also finds support in a long line of abstention cases beginning with the Supreme Court's decision in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). There the Court held that the district court properly declined to exercise jurisdiction of plaintiff's claims challenging the validity of an order of the Texas Railroad Commission. The Court found that "[d]elay, misunderstanding of local law, and needless federal conflict with the State policy, are the inevitable product" of federal adjudication of such claims. *Id.* at 327, 63 S.Ct. at 1104.

The concerns reflected in the *Burford* abstention are those of federalism and comity—the notion that the federal government should accord a "proper respect for state functions." *Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971); *see Society for Good Will to Retarded Children v. Cuomo,* 652 F.Supp. 515, 523 (E.D.N.Y.1987). The *Burford* doctrine embodies these concerns by enabling a federal court to "abstain from interfering with ongoing state regulatory schemes." *Levy v. Lewis,* 635 F.2d 960, 963 (2d Cir. 1980). Thus, in *New Orleans Pub. Serv. v. City of New Orleans,* 798 F.2d 858 (5th Cir.1986), *cert. denied,* 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 515 (1987), the district court properly abstained from a suit involving a utility's application for a permanent rate increase. The complexity of utility regulation and the state's paramount interest in its regulatory system warranted abstention:

> The motivating force behind *Burford* abstention is ... a reluctance to intrude into state proceedings where there exists a complex state regulatory system.... As with the regulatory scheme at issue in *Burford,* the regulation and adjustment of local utility rates is of paramount local concern and a matter which demands local administrative expertise.

*Id.* at 861–62. And in *Hanlin Group, Inc. v. Power Authority of the State of New York,* 703 F.Supp. 305 (S.D.N.Y. January 13, 1989), a rate dispute case concerning the sale of electric power, the court relied on the *Burford* doctrine to dismiss the plaintiff's claims because

> in deciding this case, the court would be inevitably drawn into the complex process of utility ratemaking in New York. That is precisely the activity area which *Burford* abstention intended to relegate to state adjudication.

703 F.Supp. at 311. *See also Levy v. Lewis,* 635 F.2d 960, 964 (2d Cir.1980) (abstention required where federal review of plaintiff's claim would interfere with New York's "complex administrative and judicial" insurance regulatory scheme); *Law Enforcement Ins. Co. v. Corcoran,* 807 F.2d 38, 43–44 (2d Cir.1986) (same); 15

U.S.C. §§ 1011–1015 (regulation of the insurance industry left to the states).

■■■■■ The fact that federal claims form the jurisdictional basis of a plaintiff's complaint is not significant in the application of *Burford* abstention. *See Levy v. Lewis*, 635 F.2d at 964 (observing that federal claims were present in the *Burford* case itself). Nor is there any requirement that complex issues of state law be presented for federal adjudication in order for *Burford* abstention to be appropriate. *Id.; New Orleans Pub. Serv. v. City of New Orleans*, 798 F.2d at 861.

The *Burford* doctrine has been held applicable to the adjudication of RICO claims that would interfere with important matters of local concern. *See Dubroff v. Dubroff,* 833 F.2d 557 (5th Cir.1987) (RICO claims arising from divorce proceedings dismissed without prejudice to allow a plaintiff to pursue claims in Texas state courts); *Bradenburg v. First Md. Savings and Loan,* 660 F.Supp. 717, 734 (D.Md. 1987), *aff'd,* 859 F.2d 1179 (4th Cir.1988) (RICO claims against savings and loan associations in state receivership dismissed).

■■■ Exercise of RICO jurisdiction in this case "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (describing circumstances under which *Burford* abstention is appropriate). Abstention is proper when, as here, monetary damages are being sought. *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 107–13, 102 S.Ct. 177, 181–85, 70 L.Ed.2d 271 (1981).

State regulation of utilities is a matter of "substantial public concern." State interests in this area are enormous. *See, e.g., Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n,* 461 U.S. 375, 377, 103 S.Ct. 1905, 1908, 76 L.Ed.2d 1 (1983) ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States."); *Panhandle Eastern Pipe Line Co. v. Public Serv. Comm'n of Ind.*, 332

U.S. 507, 521, 68 S.Ct. 190, 197, 92 L.Ed. 128 (1947) (the states have a "vital interest[ ] in the regulation of rates and service" where utilities are concerned).

Note should also be made of the Johnson Act, 28 U.S.C. § 1342. It bars federal courts from interfering with any state order affecting utility rates when: 1) jurisdiction is based solely on diversity or a constitutional claim; 2) the order does not interfere with interstate commerce; 3) the order has been made after reasonable notice and hearing; and 4) there is an adequate remedy in the state courts. The Act does not by its terms apply to a RICO action, but it is another strong indicator that Congress intended state ratemaking to be free from unnecessary federal court intrusions. *See Miller v. New York Pub. Serv. Comm'n,* 807 F.2d 28, 32–33 (2d Cir.1986) ("the aim of Congress [with the Johnson Act] was to remove completely the subject of utility rates from the federal courts," and thus "abolition of jurisdiction in the federal courts ... must [be] read to reach broadly over all jurisdiction in rate cases, including the awarding of money damages"); *Hanna Mining Co. v. Minnesota Power & Light Co.,* 739 F.2d 1368, 1370 (8th Cir.1984) ("The Act is to be broadly applied to keep challenges to orders affecting rates out of the federal courts.").

There is no need to describe other related abstention doctrines at this time except to note that they interact in this case to strengthen the conclusion that RICO does not require manhandling a subtle and comprehensive state regulatory scheme. *See, e.g.,* L.H. Tribe, American Constitutional Law, 195–201 (2d ed. 1988); C.A. Wright, Law of Federal Courts § 52 (4th ed. 1983).

### 3. "Our Federalism"

The protection of state institutional autonomy is a matter of deep concern to federal courts. Even in the case of constitutional challenges federal courts have become increasingly reluctant to interfere with state enforcement of state laws in state courts and administrative agencies. L.H. Tribe, American Constitutional Law, 201–08 (2d ed. 1988); C.A. Wright, Law of

Federal Courts § 52A (4th ed. 1983). *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), illustrates one phase of this approach in the area of criminal law. "Our Federalism," the Supreme Court pointed out is

> a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

*Id.* at 44, 91 S.Ct. at 750. In recent years the Court has broadly applied the principles articulated in *Younger* to require abstention by federal courts in order to protect the integrity of state adjudication of civil matters. *Pennzoil Co. v. Texaco,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (state judicial proceedings); *Ohio Civil Rights Comm'n v. Dayton Christian Schools,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (state administrative proceedings).

Among the recent manifestations of this reluctance to unnecessarily upset the balance of power between Washington and state capitals are cases such as *Pennhurst State Schools and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). There the Court held that a federal court hearing constitutional claims brought against state officials may not entertain pendent claims that the defendants violated state law. Said the Court:

> [I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

*Id.* at 106, 104 S.Ct. at 911. In the instant case it is apparent that while LILCO is the defendant, the challenge is really to the actions of the PSC and its commissioners under state law. Pursuant to New York law, the PSC is directed to set "just and reasonable" rates. New York Public Service Law § 72. The federal court here is being asked to determine whether in fact the commissioners did so.

A construction of RICO which permits a jury to retroactively reduce electric rates may violate the Tenth Amendment to the United States Constitution. In *Gulf Water Benefaction Co. v. Public Util. Comm'n of Tex.,* 674 F.2d 462 (5th Cir.1982), the Court of Appeals affirmed the bankruptcy court's order dismissing an adversary petition that sought to enjoin rates promulgated by the Public Utility Commission of Texas. The court stated:

> [T]he power to regulate intrastate services such as utilities has historically been reserved to the states by Congress pursuant to the provisions of the tenth amendment of the United States Constitution. *Public Utilities Commission for State of Kansas v. Landon,* 249 U.S. 236, 39 S.Ct. 268, 63 L.Ed. 577 (1919). In Texas [as in New York] it is fundamental that the fixing of domestic utility rates is a legislative function of the state government.

*Id.* at 467. *See Brooklyn Union Gas Co. v. Maltbie,* 245 A.D. 74, 281 N.Y.S. 233 (3d Dep't 1935) (ratemaking is a legislative function and the PSC exercises authority delegated to it by the state legislature); *Montalvo v. Consolidated Edison Co.,* 92 A.D.2d 389, 398, 460 N.Y.S.2d 784, 790 (1st Dep't 1983), *aff'd,* 61 N.Y.2d 810, 473 N.Y. S.2d 972, 462 N.E.2d 149 (1984) ("the PSC is a delegate and alter ego of the Legislature").

The exercise of delegated legislative authority by a state administrative agency is a manifestation of the republican form of government guaranteed to the states by Article IV, section 4, of the Constitution. *Highland Farms Dairy v. Agnew,* 300 U.S. 608, 612, 57 S.Ct. 549, 551, 81 L.Ed. 835 (1937). Sidestepping PSC review of utility rates by permitting ratepayers to petition a federal court to redress rate-related grievances denies the state a voice in these rate matters. It reduces the state's role without warrant or need and ultimately undermines the "guarantee to every State in this Union [of] a Republican Form of Government". U.S. Constitution, Article IV, section 4. *See Federal Energy Regulatory*

*Comm'n v. Mississippi,* 456 U.S. 742, 789–90, 102 S.Ct. 2126, 2153–54, 72 L.Ed.2d 532 (1982) (O'Connor, J., concurring in the judgment in part and dissenting in part); L.H. Tribe, American Constitutional Law, 397–98 (2d ed. 1988).

Recently the Supreme Court reaffirmed its great deference to the states in rate-making when it rejected allegations that denying utilities compensation for abandoned nuclear plants constituted an unconstitutional taking. *Duquesne Light Co. v. Barasch,* —— U.S. ——, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989); *Public Serv. Co. of N.H. v. New Hampshire,* —— U.S. ——, 109 S.Ct. 858, 102 L.Ed.2d 983 (1989). These cases recognized that ratemaking is essentially a state legislative matter whether control is exercised directly by a state legislature or indirectly by the legislature's nominee, a state public service commission.

### 4. Doctrine of Clear Statement

■■■ These intertwined federalism doctrines have led to the rule of "clear statement." L.H. Tribe, American Constitutional Law, 316 (2d ed. 1988). Because of the expansive reach of federal power under the Commerce Clause, the Supreme Court is wary of applying congressional legislation to areas that Congress probably did not intend to reach. When application of legislation in particular situations might alter the federal-state balance, the Court looks for a "clear statement that Congress intended to exercise its ... power in full." *Id.* This occurs most notably, Professor Tribe asserts, when state institutional interests are threatened. *Id. See, e.g., Federal Trade Comm'n v. Bunte Bros.,* 312 U.S. 349, 355, 61 S.Ct. 580, 583, 85 L.Ed. 881 (1941) ("An inroad upon local conditions and local standards of such far-reaching import as is involved here, ought to await a clearer mandate from Congress."). The purpose of the doctrine is to ensure that federal legislation is not applied in a manner that may alter the delicate balance of federal and state power unless Congress has carefully considered and fully intended such a result. *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971). *See, e.g., McNally v. United*

*States,* 483 U.S. 350, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987) (stating "[i]f Congress desires to go further it must speak more clearly than it has," the Court declined an expansive reading of the mail fraud statute, 18 U.S.C. § 1341, that would "involve the Federal Government in setting standards of disclosure and good government for local and state officials.").

The doctrine is now more often invoked in the context of criminal law, but RICO is basically a criminal statute that may be used by private litigants in the civil arena. No specific language in RICO is ambiguous. Nevertheless, the great difficulty courts have had in applying the statute in civil cases indicates a general uncertainty of purpose—i.e., ambiguity of scope.

Civil RICO cases provide dangers to defendants in some respects even greater than do criminal cases. In criminal cases proof beyond a reasonable doubt is required. In civil cases a preponderance of the evidence suffices. *Cullen v. Margiotta,* 811 F.2d 698, 731 (2d Cir.), *aff'd sub nom. Nassau County Republican Comm. v. Cullen,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987) (preponderance of the evidence standard applies in civil RICO cases). Before a criminal RICO case can be brought, there must be an indictment by a grand jury and specific permission must be obtained from the Department of Justice, which has strict internal guidelines governing the prosecution of RICO actions. *See* United States Attorney's Manual, Title 9 at 9–110.300 et seq.; *Sedima,* 473 U.S. at 507, 105 S.Ct. at 3295 (Marshall, J., dissenting). There is no inhibition on the commencement of a civil RICO action except limits on the imagination of counsel. Here the nature of the charges are such that it is almost inconceivable that a RICO criminal prosecution would have been authorized or survived a motion to dismiss without trial. Because of the extreme dangers of overreaching in civil cases, care must be taken to ensure that the RICO statute is not extended beyond the reach envisaged by Congress.

In civil cases the Court has repeatedly applied the rules of deference to spheres of activity traditionally left to the states. It has invoked the doctrine to restrict the scope of both statutes and administrative regulations in protecting state sovereignty. For example, in *Santa Fe Industries v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Court declined to read section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, as providing a private remedy for the breach of corporate fiduciary duty alleged by the plaintiff. Said the Court:

> [T]his extension of the federal securities laws would overlap and quite possibly interfere with state corporate law.... Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, *particularly where established state policies of corporate regulation would be overridden.*

*Id.* at 479, 97 S.Ct. at 1304 (emphasis added). In *Bowen v. American Hospital Ass'n,* 476 U.S. 610, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986), the Court rejected a national administrative regulation designed to protect handicapped infants. The regulation had been adopted pursuant to section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 794. The plurality opinion relied heavily upon "our federal system", *id.,* 106 S.Ct. at 2121, and the need to defer to a tradition of state and parental control of children's welfare unless Congress clearly indicates an intent to override state powers. The Court noted:

> Congress has failed to indicate, either in the statute or in the legislative history, that it envisioned federal superintendence of treatment decisions traditionally entrusted to state governance. "[W]e must assume that the implications and limitations of our federal system constitute a major premise of all congressional legislation, though not repeatedly recited therein." *United States v. Gambling Devices,* 346 U.S. 441, 450, 74 S.Ct. 190, 195, 98 L.Ed. 179 (1953) (opinion of Jackson, J.) [footnote omitted]. Congress therefore "will not be deemed to have significantly changed the federal-state balance," *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971)—or to have authorized its delegates to do so—"unless otherwise the purpose of the Act would be defeated," *Trade Comm'n v. Bunte Bros.,* 312 U.S. 349, 351, 61 S.Ct. 580, 582, 85 L.Ed. 881 (1941).[33] Although the nondiscrimination mandate of § 504 is cast in language sufficiently broad to suggest that the question is "not one of authority, but of its appropriate exercise[,] [t]he propriety of the exertion of the authority must be tested by its relation to the purpose of the [statutory] grant and with suitable regard to the principle that whenever the federal power is exerted within what would otherwise by the domain of state power, the justification of the exercise of the federal power must clearly appear." *Florida v. United States,* 282 U.S. 194, 211–12, 51 S.Ct. 119, 123–24, 75 L.Ed. 291 (1931). Accord, *Chicago, M., St. P. & P.R. Co. v. Illinois,* 355 U.S. 300, 306, 78 S.Ct. 304, 308, 2 L.Ed.2d 292 (1958).

*Id.,* 106 S.Ct. at 2121–2122.

In its footnote 33 the plurality opinion for the Court collected many instances of deference to state regulatory power. An expansive interpretation of national legislation that overrides state authority is undesirable, the footnote indicated, unless it is necessary to carry out the clearly expressed aims of Congress. Footnote 33 reads as follows:

> Cf. *Heublein, Inc. v. South Carolina Tax Comm'n,* 409 U.S. 275, 281–282 [93 S.Ct. 483, 488–489, 34 L.Ed.2d 472], (1972) (" '[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the Federal–State balance.' " (quoting *United States v. Bass,* 404 U.S. 336, 349 [92 S.Ct. 515, 523, 30 L.Ed.2d 488], (1971))); *Davis Warehouse Co. v. Bowles,* 321 U.S. 144, 152 [64 S.Ct. 474, 479, 88 L.Ed. 635], (1944) ("Where Congress has not clearly indicated a purpose to precipitate conflict [between federal agencies and state authority] we should be reluctant to do so by decision." (footnote omitted)); *Penn*

*Dairies, Inc. v. Milk Control Comm'n,* 318 U.S. 261, 275 [63 S.Ct. 617, 623, 87 L.Ed. 748], (1943) ("An unexpressed purpose of Congress to set aside statutes of the states regulating their internal affairs is not lightly to be inferred and ought not to be implied where the legislative command, read in the light of its history, remains ambiguous"); *FTC v. Bunte Bros., Inc.,* 312 U.S. 349, 354–355 [61 S.Ct. 580, 583–584, 85 L.Ed. 881], (1941) ("The construction of § 5 [of the Federal Trade Commission Act] urged by the Commission would thus give a federal agency pervasive control over myriads of local businesses in matters heretofore traditionally left to local custom or local law.... An inroad upon local conditions and local standards of such far-reaching import as is involved here, ought to await a clearer mandate from Congress"); *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 513 [60 S.Ct. 982, 1002, 84 L.Ed. 1311], (1940) ("The maintenance in our federal system of a proper distribution between state and national governments of police authority and of remedies private and public for public wrongs is of far-reaching importance. An intention to disturb the balance is not lightly to be imputed to Congress"); *United States v. Altobella,* 442 F.2d 310, 313–316 (7th Cir. 1971); 3 C. Sands, Sutherland on Statutory Construction § 62.01, p. 64 (4th ed. 1974) ("[T]he rule of strict construction [of statutes in derogation of sovereignty] serves a quasi-constitutional purpose in our federal system of split sovereignty by helping to secure both levels of sovereign power against encroachment by each other." (footnote omitted)).

The legislative history of the Rehabilitation Act does not support the notion that Congress intended intervention by federal officials into treatment decisions traditionally left by state law to concerned parents and the attending physicians or, in exceptional cases, to state agencies charged with protecting the welfare of the infant. As the Court of Appeals noted, there is nothing in the legislative history that even remotely suggests that Congress contemplated the

possibility that "section 504 could or would be applied to treatment decisions, involving defective newborn infants." [*U.S. v. University Hospital,*] 729 F.2d 144, 159 ([2nd Cir.] 1984). " 'As far as can be determined, no congressional committee or member of the House or Senate ever even suggested that section 504 would be used to monitor medical treatment of defective newborn infants or establish standards for preserving a particular quality of life. No medical group appeared alert to the intrusion into medical practice which some doctors apprehend from such an undertaking, nor were representatives of parents or spokesmen for religious beliefs that would be affected heard.' " *Id.,* at 158 (quoting *American Academy of Pediatrics v. Heckler,* 561 F.Supp. [395], at 401 [ (D.C.D.C.1983) ] ).

*Id.,* 106 S.Ct. at 2121 n. 33.

The "clear statement" doctrine indicates that in this case federal review through RICO of state regulatory decisions is inappropriate. The Supreme Court has said that when Congress legislates in a field traditionally occupied by the states, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' This assumption provides assurance that 'the federal-state balance' will not be disturbed unintentionally by Congress or unnecessarily by the courts. *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). *See also Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n,* 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983) (balancing state and federal interests and concluding that state interest in regulating wholesale rates of rural power cooperatives outweighs federal concerns when the effect of the state regulation upon interstate commerce is not excessive and Congress has not specifically forbidden this assertion of state authority). On its face the RICO

statute may not appear to be legislation in a field "traditionally occupied by the states." To apply the statute to the facts of the present case would, however, lead to exactly that result—the intrusion of federal authority into an area historically reserved to state control. In such a situation the "clear statement" doctrine and the federalism concerns that underlie it are properly invoked.

Suffolk attempts to minimize the extent to which its RICO claims intrude into the sphere of state ratemaking authority by characterizing the relief it seeks as monetary damages rather than affirmative rate relief. Contrary to its contentions, its alleged injuries are in the form of utility rate increases previously approved by the PSC. Moreover, the damages it seeks are an amount equal to that portion of these rate increases that would—in its submission—not have been granted by the PSC except for the defendants' alleged misrepresentations.

The distinction that Suffolk attempts to draw between damages measured by rate increases and affirmative rate relief is illusory. Where a plaintiff seeks to recover damages measurable by a comparison between approved utility rates and rates that would have been approved but for a defendant's wrongdoing, the plaintiff's claim is treated as one for rate relief. *See, e.g., Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981); *County of Suffolk v. Long Island Lighting Co.,* 554 F.Supp. 399 (E.D.N.Y. 1983), *aff'd,* 728 F.2d 52 (2d Cir.1984); *H.J., Inc. v. Northwestern Bell Tel. Co.,* 648 F.Supp. 419 (D.Minn.1986), *aff'd on other grounds,* 829 F.2d 648 (8th Cir.1987), *cert. granted,* — U.S. ——, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988).

Rate relief obtained through a federal RICO action, whether provided in the form of monetary damages or otherwise, is highly disruptive of New York's regulatory scheme. Under New York law, the PSC has exclusive jurisdiction over utility rates, and the administrative remedies provided by the state supersede all other remedies. *Purcell v. N.Y. Central R.R.,* 268 N.Y. 164, 171, 197 N.E. 182, *appeal dismissed,* 296 U.S. 545, 56 S.Ct. 173, 80 L.Ed. 387 (1935); *Van Dusen–Storto Motor Inn, Inc., v. Rochester Tel. Corp.,* 42 A.D.2d 400, 403, 348 N.Y.S.2d 404, 407 (4th Dep't 1973), *aff'd mem.,* 34 N.Y.2d 904, 359 N.Y.S.2d 286, 316 N.E.2d 719 (1974); *Central Hudson Gas & Elec. Corp. v. Napoletano,* 277 A.D. 441, 443, 101 N.Y.S.2d 57 (3d Dep't 1950); *Cardone v. Consolidated Edison Co.,* 197 Misc. 188, 190, 94 N.Y.S.2d 94, 97 (N.Y.App.Term.), *aff'd,* 276 A.D. 1068, 96 N.Y.S.2d 491 (1st Dep't 1950). *See also County of Suffolk v. Long Island Lighting Co.,* 728 F.2d 52, 61 (2d Cir.1984) (affirming dismissal of Suffolk's common law claims, including misrepresentation, arising out of the Shoreham construction). When fraud in the ratemaking process is suspected, "the jurisdiction of the [Public Service] Commission at once attaches." *New York State Elec. & Gas Corp. v. Public Serv. Comm'n,* 245 A.D. 131, 135, 281 N.Y.S. 384, 387–88 (3d Dep't 1935), *aff'd,* 274 N.Y. 591, 10 N.E.2d 567 (1937).

The undeniable effect of permitting federal court review of claims such as those brought by Suffolk is to bypass state review of allegations of fraud in the ratemaking process. It allows litigants to short circuit the elaborate state scheme provided by New York for review of rate-related matters. *See HMK Corp. v. Walsey,* 828 F.2d 1071, 1076–77 (4th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 706, 98 L.Ed. 2d 657 (1988) (questioning application of RICO to local zoning dispute). Thus the application of RICO in a case such as this results in a federal abrogation of New York's decision that review of rate-making matters should be exclusively the province of the state-created remedial scheme.

The practical effect of permitting federal review of these claims under the RICO statute—with its lure of treble damages and attorneys' fees—will be that in the future ratepayers will bring many such claims in federal court. The PSC might well initiate its own investigation into the claims, but then the problems of federal-state coordination are enormous. For instance, what effect should the PSC give to a federal jury's determination that the PSC itself was the victim of a utility's fraudu-

lent misrepresentations? And what effect should the PSC give to a jury's determination that the misrepresentations influenced its rate decisions in specific ways? Suppose that in its own investigation the PSC reaches different conclusions with regard to these matters. Can the PSC then ignore the jury verdict? If not, the state will be effectively deprived of a meaningful opportunity to arrive at its own determinations with respect to these claims. It will be left without the means to bring its expertise in ratemaking matters to bear, and it will be unable to frame relief that is harmonious with the wider state regulatory scheme and that is informed by uniquely local perspectives on such matters of overwhelmingly local concern.

In the very case now before us we were informed that the PSC was withholding decisions on rate applications of LILCO, claimed to be essential to forestall bankruptcy, pending decision of this RICO case. We are not left to speculation. RICO as sought to be applied by Suffolk was interfering with New York's regulatory scheme.

We should not assume that Congress intended to alter the historic federal-state balance in so dramatic a fashion. If the end result of entertaining claims such as Suffolk's in federal court is a defacto preemption, depriving the states of the opportunity to consider the claims in a meaningful fashion and upsetting the exclusive remedial measures provided by states for review of rate regulation matters, federal courts must assume that Congress intended that we refuse to hear the claims. *See Sedima*, 473 U.S. at 507, 105 S.Ct. at 3295 (Marshall, J., dissenting).

What makes the application of RICO in this situation especially inappropriate is that national power is being utilized not as the result of an affirmative decision by the national government to intrude into state regulatory affairs in order to vindicate important federal interests, but as the result of actions by private litigants. The process-based protection of state sovereignty envisaged by *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550–55, 105 S.Ct. 1005, 4017–20, 83 L.Ed.2d 1016 (1985), is short-circuited when a broadly framed statute such as RICO is used by private persons or local governments in ways which upset the balance of federal-state power that were never forseen by the state representatives in Congress who approved the statute.

Even in the field of nuclear safety regulation where the national interest is strongly asserted, the Court has refused to find the states' institutions for protection of the public through its tort law preempted. *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 256, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984). *See also* G.M. Vairo, Survey of Recent Preemption Cases, in ALI–ABA, I Trial Evidence, Civil Practice and Effective Litigation Techniques in Federal and State Court, 255 (S. Schreiber ed. 1988). Federal law is, where reasonably possible, construed to avoid destruction of a state program to protect its citizens.

Balancing of pragmatic considerations in our complex scheme of separation of powers and of governmental functions between state and national governments requires some national humility in the face of historical experience. *Cf. e.g., Mistretta v. United States*, — U.S. —, —, 109 S.Ct. 647, 650, 102 L.Ed.2d 714 (1989) (upholding sentencing guidelines on historic and pragmatic grounds). History as well as policy warrants leaving electric power rate regulation to skilled state commissions rather than to federal RICO juries unless Congress plainly requires otherwise.

Dismissal of unfounded claims after a trial at which the plaintiff obtained a verdict in its favor is sound practice. *See, e.g., Apex Hosiery v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940) (invoking doctrine of "clear statement" to dismiss plaintiff's claims after plaintiff had obtained a jury verdict in its favor and an award of damages in excess of $700,000); *Alabama Pub. Serv. Comm'n v. Southern Ry. Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) (relying on *Burford* abstention to reverse a trial verdict in favor of plaintiff); *United States v. Yellow Freight Sys.*, 762 F.2d 737 (9th Cir.1985) (applying doctrine of primary jurisdiction to set aside a trial verdict in favor of plaintiff).

■ No right of Suffolk to a jury trial, provided by the Seventh Amendment to the

United States Constitution, is implicated by the dismissal of the County's claims. When, as here, federal law provides no basis for the exercise of federal jurisdiction, there is no cognizable cause of action to which the Seventh Amendment guarantee can apply.

## IV. CONCLUSION

RICO does not apply to a rate regulation case such as the one before us. Suffolk's claims are dismissed without costs or disbursements.

The court recognizes the difficult emotional, economic, environmental and political issues surrounding Shoreham. It is not too late to settle these swirling controversies. There is no time better than now for resolution of the entire controversy. Even this case can go on almost indefinitely during protracted appeals which can only benefit the lawyers and put LILCO at further risk. Removal of uncertainty by the parties and officials is essential to the welfare of Long Island.

So ordered.