**Frederick Rodgers CARR, Carr Sales Company, and O.E.M. Products, Inc., Timothy Dunn Stokely, Clark Stokely, III, and all others Similarly Situated, Plaintiffs,**

v.

**The SOUTHERN COMPANY, Southern Company Services, Inc., Georgia Power Company, and Arthur Andersen & Co., Defendants.**

**Civ. A. No. CV189–118.**

United States District Court, S.D. Georgia, Augusta Division.

March 1, 1990.

Joe C. Freeman, Jr., Richard H. Gill, A. Timothy Jones, J. Fairley McDonald, III, Jack N. Sibley, Robert D. Segall and Andrew M. Scherffius, Atlanta, Ga., Theresa M. Gallion, John A. Boudet and Jerry Ray Linscott, Orlando, Fla., Larry D. Moffett, Thomas A. Bell and Jackson H. Ables, III, Jackson, Miss., S. Lynne Stephens, Andrew P. Campbell and Eddie Leitman, Birmingham, Ala., and William Byrd Warlick and Jack B. Long, Nixon, Yow, Waller & Capers, Augusta, Ga., for plaintiffs.

Wyck A. Knox, Jr., Augusta, Ga., Daniel S. Reinhardt, Hugh M. Davenport, James E. Joiner, Winifred D. Simpson, Michael C. Russ and M. Robert Thornton, Atlanta, Ga., and Robert L. Allgood, Allgood & Daniel, Augusta, Ga., for defendants.

## ORDER

BOWEN, District Judge.

Plaintiffs are residents of Georgia and seek to represent a class of ratepayers for electrical power within the state. They bring this suit against the electric utility defendants as well as Arthur Andersen & Co., the certified public accountant for the utility defendants. Plaintiffs allege that defendants, through their accounting methods, inflated maintenance costs submitted to the Public Service Commission (PSC) by expensing maintenance and emergency spare parts in the year purchased when in fact the spare parts were not used, if at all, until subsequent years. Plaintiffs maintain that generally accepted accounting principles endorsed by the PSC require defendants to expense the maintenance spare parts in the year that they are used, instead of the year in which they are acquired, and that the emergency spare parts are to be capitalized over the life of the defendants' power plants.

Plaintiffs allege that defendants committed fraud by employing these accounting methods to obtain rate increases from the PSC. The alleged fraudulent scheme has been in existence since at least 1975 and has resulted in over 60 million dollars of improper rate increases. Plaintiffs have submitted documentation which shows that as of December 31, 1985, Georgia Power Company had on hand in inventory $117,-903,014.00 worth of spare parts which have already been expensed with PSC approval. According to plaintiffs, defendants' scheme was discovered only after an accountant for Georgia Power agreed to go "undercover" for the IRS in connection with an unrelated tax investigation.

Plaintiffs' initial complaint contained only four counts which all alleged violations of the Federal Civil Racketeering Statute (RICO). Subsequently, plaintiffs amended their complaint which now consists of 13 counts: the four RICO counts plus nine new counts for the alleged violations of the Sherman Antitrust Act, the Public Utility Holding Company Act, 42 U.S.C. §§ 1983 and 1985, the Federal Power Act, and pendent state law causes of action. Defendants have moved the Court to dismiss each and every claim in plaintiffs' amended complaint. As grounds for their motion defendants offer three predominant and interrelated arguments: (1) the plaintiffs have not presented a justiciable case or controversy because they seek "judicial ratemaking", relief which the federal courts lack the power to grant, (2) the Court should abstain from addressing the plaintiffs' claims to avoid needless conflict with state policies and disruption of the State of Georgia's regulation of public utilities, and (3) the plaintiffs' failure to exhaust administrative remedies causes essential elements of their claims to be lacking. Before addressing plaintiffs' claims within the context of defendants' motions to dismiss, it is important to first highlight Georgia law with respect to the PSC's regulation of public utilities.

In Georgia, electric utilities are required to file their rate schedules with the PSC pursuant to O.C.G.A. § 46-2-25(a). The PSC has "exclusive power to determine what are just and reasonable rates." O.C.G.A. § 46-2-23(a). Electric utility companies are required to charge no more than the current filed rate. O.C.G.A. § 46-2-25(a).

The Georgia Supreme Court has stated that "[w]hat is a 'just and reasonable rate' is basically a matter of policy. It involves an intelligent estimate of present and probable future values and is at best an approximation." *Georgia Power Co. v. Allied Chemical Corp.*, 233 Ga. 558, 559, 212 S.E.2d 628 (1975). "[W]hen the commission establishes a rate, such act is legislative in character, and binds all parties concerned in the same manner as if the rate had been fixed by an act of the General Assembly." *Georgia Public Service Commission v. Atlanta Gas Light Co.*, 205 Ga. 863, 883, 55 S.E.2d 618 (1949). The commission's authority to regulate rates is prospective only, and the commission does not have the power to determine that rates charged pursuant to a filed schedule were unreasonable and award reparations. *Georgia Public Service Commission v. Atlanta Gas Light Co.*, 205 Ga. at 888, 55 S.E.2d 618.

Judicial review of the Commission's decisions may be obtained by petitioning the Superior Court of Fulton County. O.C.G.A. § 50–13–19(b). However, the courts lack jurisdiction to consider any exceptions to a decision of the commission that were not first raised before the commission. O.C.G.A. § 50–13–19(c). In reviewing rates fixed by the commission, the court cannot establish any particular rate as being "just and reasonable", since this function is exclusively delegated to the commission. *Southern Bell T. & T. Co. v. Georgia Public Service Commission*, 203 Ga. 832, 870, 49 S.E.2d 38 (1948). Georgia does not permit collateral attacks on the reasonableness of rates filed with the commission. *Norman v. United Cities Gas Co.*, 231 Ga. 788, 204 S.E.2d 127 (1974). Neither side contests these issues of Georgia public utility law. Having reviewed the parties extensive "briefs" and having heard their excellent oral arguments during the hearing of February 13, 1990, I now address defendants' motions to dismiss.

Defendants' arguments in support of their motions to dismiss, as heretofore enumerated, are not limited to any particular federal claim, but, rather, are made with respect to all of plaintiffs' federal claims. Plaintiffs rely upon the federal RICO statute as the basis for the Court's jurisdiction to hear their claims. Indeed, a federal civil RICO case appears to be the most apt vehicular means to attain federal jurisdiction. Consequently, the discussion may focus most significantly upon the federal civil RICO claims with the understanding that much of what is said is also applicable to the other federal claims.

In response to the defendants' contention that plaintiffs are attempting to involve the Court in judicial ratemaking of a public utility, plaintiffs argue that the amount of monetary damages that they are seeking can be measured to a mathematical certainty. Plaintiffs maintain that they are not challenging the PSC's determination of what constitutes just and reasonable electric rates. Rather, plaintiffs argue that they are seeking a specific and provable amount of damages resulting from the alleged fraudulent accounting practices of defendants. Defendants rebut this argument by stating that, in essence, plaintiffs are seeking the difference between the rate approved by the PSC and the rate which would have been approved if the PSC was not defrauded by the defendants. Defendants contend that it is inconsistent for plaintiffs to claim that they are seeking relief in the amount of the inflated rates, approved by the PSC, caused by defendants fraudulent accounting practices and at the same time deny that they are challenging the reasonableness of the rates set by the PSC. Plaintiffs never argue that they were charged a rate that differed from the one approved by the PSC. Nor, do they argue that the PSC itself was involved in any wrongdoing.

Defendants contend that Congress, by enacting civil RICO, did not authorize federal courts to engage in state utility rate-making. In support of their argument, defendants offer *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1387 (E.D.N.Y.1989) (*LILCO*), which appears to be one of only two federal cases—the other case is *M.R. Taffet v. The Southern Company*, 89V–712–N, M.D.Ala., January 5, 1990—dealing with RICO claims involving a state's utility ratemaking authority. In *LILCO*, the county brought suit against a utility company under civil RICO, alleging that defendants had lied to the New York public service commission in order to obtain higher rates needed to build nuclear power plants. The jury returned a verdict in plaintiff's favor which after being trebled totaled $22.9 million. Expressing grave misgivings about having allowed the case to proceed to the jury, Judge Weinstein granted defendant's motion for judgment notwithstanding the verdict. After finding that the evidence was not insufficient to support the jury's finding that all elements of plaintiff's RICO had been established, Judge Weinstein enumerated four primary reasons for his holding: primary jurisdiction, abstention, "our federalism", and the doctrine of clear statement. Also significant is Judge Weinstein's observation that

[w]hat the trial proved almost beyond peradventure was that RICO cannot, and should not, be applied in a case such as this to permit a federal jury in a civil case to second guess the ratemaking authority of the state. In effect, the jury was asked to retroactively reset the electric rates previously fixed by the PSC with its staff of hundreds of technicians working in such arcane fields as utility ratemaking, marketing of utility securities, taxation, economics, generating plant construction, and power grids.

*County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. at 1393.

Plaintiffs attempt to distinguish the instant case from *LILCO* by proposing that the result reached in that case would have been different if, as in the instant case, fraud had been involved. However, Judge Weinstein stated "[t]his court recognized in its charge, which is the law of the case, that to say that a fraud was successfully committed against the PSC resulting in damages is, for practical purposes, to retroactively reduce electric rates." *County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. at 1396. In addition, in *M.R. Taffet v. The Southern Company,* 89V–712–N, M.D.Ala., January 5, 1990, p. 3, the court stated the following:

> While Plaintiffs' claims are based on alleged fraud, it is clear that the remedy required from this Court would constitute rate-making. Plaintiffs seek to recover the amount allegedly in excess of rates under a proper accounting method. This would require the Court to determine a "proper" rate. This new rate would apply to a likely large class of Plaintiffs. Defendants would also likely be forced to accept the Court's rate in the future to avoid further liability.[1]

Therefore, I cannot endorse the plaintiffs' arguments that both the *LILCO* and the *Taffet* cases would have been decided differently if fraud was involved. Likewise, it is difficult for me to comprehend how the relief requested by the instant case plaintiffs will not necessarily involve the Court in judicial ratemaking. Plaintiffs are challenging the accounting methods used by a public utility, an area of concern which has traditionally been recognized as belonging to the PSC. Therefore, I must echo the reservations, discussed above, of the two district court judges who have previously dealt with this issue.

Consequently, the query for the Court now becomes whether to follow the doctrines and precedents as interpreted by the *LILCO* and *Taffet* courts or chart a new course by distinguishing them. In support of their RICO claims, plaintiffs rely upon the recent United States Supreme Court case of *H.J. Inc. v. Northwestern Bell Telephone Co.,* —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In that case, customers of a telephone company brought a class action, alleging that the company gave bribes to members of the Minnesota Public Utilities Commission with the objective of causing the commissioners to approve unfair and unreasonable rates. The district court dismissed the case holding that plaintiffs had not established that the defendants had engaged in a "pattern of racketeering activity" as required under the RICO statute. The court of appeals affirmed. The Supreme Court expressly stated that it granted certiorari to resolve the conflict between circuits over whether " '[a] single fraudulent effort or scheme is insufficient' to establish a pattern of racketeering activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 109 S.Ct. at 2898 (citations omitted). The Supreme Court was not faced with the issues which confront us in the instant case, namely questions of abstention and federalism. Thus, *H.J. Inc.* is inapposite to the defendants' arguments in our particular case.

Next, plaintiffs argue that federal case law generally has held that the RICO statute should be construed broadly, and that it is not the job of federal courts to limit its application. *Sedima v. Imrex Co.,* 473 U.S.

---

1. The factual allegations in the Alabama federal district court case appear to be almost identical to those in the instant case. However, the Alabama case only involved RICO and state law fraud claims. Judge Varner granted defendants' motion to dismiss on grounds similar to those discussed in *LILCO.*

479, 497–98, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985). The RICO statute itself lends credence to plaintiffs' argument by including within its predicate acts conduct which has traditionally been of state and not federal concern. See 18 U.S.C. § 1961(1). However, plaintiffs do not cite to any case which broadly construes RICO in the context of a state agency's exclusive authority to regulate rates charged by a public utility. Furthermore, the primary jurisdiction doctrine proscribes that an agency, rather than a court, handle issues requiring special expertise. *United States v. Western Pacific RR Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 164, 1 L.Ed.2d 126 (1956).

Finally, plaintiffs argue that application of the civil RICO statute in this case will not violate principles of federalism nor abstention. Plaintiffs rely on *New Orleans Public Service, Inc. v. Council of City of New Orleans, (NOPSI)* —— U.S. ——, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), for the proposition that the doctrine of federal abstention does not apply where the PSC has made its final decision.[2] Plaintiffs allege that under Georgia law, the PSC lacks authority to correct the past wrongful conduct of defendants and that there is no interference with the PSC's expertise since it is powerless to act. However, in *NOPSI*, the question was one of federal preemption by the FERC over the state ratemaking body with respect to interstate wholesale power transactions. The Supreme Court reasoned that

> [u]nlike a claim that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state law factors, federal adjudication of this sort of preemption claim would not disrupt the State's attempt to ensure uniformity in

the treatment of an "essentially local problem".

*New Orleans Public Service, Inc. v. Council of City of New Orleans*, 109 S.Ct. at 2514–15 (quoting *Alabama Pub. Serv. Comm'n v. Southern R. Co.*, 341 U.S. 341, 347, 71 S.Ct. 762, 767, 95 L.Ed. 1002 (1951)). The *NOPSI* Court also found that the orders of the state commission were invalid on their face; therefore, no inquiry beyond the orders themselves would be necessary to resolve the preemption dispute. *Id.* 109 S.Ct. at 2515. In addition the Supreme Court reaffirmed the *Burford*[3] abstention test by stating

> [b]ut since, as the facts of this case amply demonstrate, wholesale electricity is not bought and sold within a predominantly local market, it does not demand significant familiarity with, and will not disrupt state resolution of, distinctively local regulatory facts or policies. The principles underlying Burford are therefore not implicated.

*Id.* at 2515.

▮ Plaintiffs have made a valiant attempt to analogize the instant case facts to those found in the *NOPSI* case. However, I conclude that the relief requested by plaintiffs would require the Court to go beyond the face of the PSC's order. The Court would necessarily be required to delve into questions concerning local regulatory facts and problems. Moreover, it is difficult to think of a greater local concern than a state's regulation of a public utility's retail sale of intrastate electricity. "[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police powers of the states." *Arkansas Elec. Coop. Corp. v. Arkansas Public Service Com.*, 461 U.S. 375, 377, 103 S.Ct. 1905, 1908, 76 L.Ed.2d 1

---

2. In *New Orleans Public Service, Inc.*, the Federal Regulatory Energy Commission (FERC), acting pursuant to its exclusive regulatory authority over interstate wholesale power transactions, allocated the costs of a nuclear reactor among several utility companies which made up an interstate power pool. One of these power companies, *NOPSI*, sought a rate increase from the New Orleans city council, the ratemaking body, to cover the costs allocated to it by the FERC. When the city council failed to grant the rate increase, *NOPSI* brought this federal suit.

3. In *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), the Supreme Court affirmed an order of the district court dismissing a complaint of Sun Oil Company in a suit against the Railroad Commission of Texas to enjoin the execution of an order of the Commission which permitted the drilling and operation of certain oil fields in East Texas.

(1983). The clear statement doctrine prevents intrusion of federal statutes into areas of traditional state concern unless Congress clearly indicates otherwise. *McNally v. United States,* 483 U.S. 350, 360, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987).

■ The fact that the state of Georgia has made a conscious decision to preclude the PSC from making reparations for past fraudulently obtained electric rates does not automatically entitle plaintiffs to a federal forum. Plaintiffs, as previously discussed, are afforded some administrative types of relief, which they concede have not been exhausted. These forms of relief may not be the type which they desire; however, as stated, in another context, by Justice Blackmun "[t]he propriety of abstention should not depend on the State's choice to vindicate its interests by a less drastic, and perhaps more lenient route." *Trainor v. Hernandez,* 431 U.S. 434, 449–50, 97 S.Ct. 1911, 1921, 52 L.Ed.2d 486 (1977). Moreover, plaintiffs have failed to point to a significant federal interest which would justify the Court's intervention.

In further support of their motions to dismiss, defendants point to the filed rate doctrine which prohibits courts from altering rates filed and approved by administrative agencies. *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951). In *Montana–Dakota,* petitioner's predecessor and respondent, both public utility electric companies, had formed interlocking directorates, with the approval of the Federal Power Commission, whereby they shared expenses and made a number of contracts between the two companies establishing rates and charges which were filed with and accepted by the Commission. Petitioner's complaint alleged that the interlocking directorship was used fraudulently to deprive it of its federally conferred right to reasonable rates and charges, and demanded reparations. In holding that petitioner had not established a cause of action, the Supreme Court stated "[t]o reduce the abstract concept of reasonableness to concrete expression in dollars and cents is the function of the Com-

mission." *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. at 251, 71 S.Ct. at 695. In addition the Court reasoned that "the prescription of the statute is a standard for the Commission to apply and, independently of Commission action, creates no right which courts may enforce." *Id.*

In the instant case, plaintiffs argue that in reaching its conclusion, the *Montana–Dakota* Court recognized a common law cause of action for fraud and deceit but dismissed the case for lack of diversity jurisdiction. *Id.* at 250, 71 S.Ct. at 694. Moreover, plaintiffs contend that the expanded jurisdiction of the federal Civil RICO statute enables this Court to make reparations for the alleged commission of fraud in the instant case. As discussed previously, I cannot find that the RICO statute authorizes such a drastic intervention into a state's authority to regulate public utilities. In addition, the *Montana–Dakota* Court concluded by stating "[h]ere the issue of reasonableness of the charges is not one clearly severable from the issues of liability, for the acts charged do not amount to fraud unless there has been an unreasonable charge." *Id.* at 253–54, 71 S.Ct. at 696. Therefore, if the Court were to allow the instant case to proceed, it would necessarily become engrossed in exclusively local concerns, namely determining what is a just and reasonable rate for retail, intrastate electricity as defined by Georgia law.

In this case, the plaintiff's allegations, which must be taken as true for motion purposes, are of stunning proportions. Fraud at the highest corporate level and damages in the scores of millions of dollars are assertions of utmost gravity. Such grist is most appropriate for the machinery of justice which turns inexorably and grinds exceedingly fine. The public interest could scarcely be better served than to expose these allegations to the cold light of litigation so that they could be substantiated or disproved. Naturally, I am concerned that a wrong could exist without a remedy; but, I have greater concern and higher regard for the principles of federalism which underlie my decision herein.

It is lamentable that allegations of the sort raised in this case cannot be fully aired by trial in a court of law, the method ordained by our system to reach justice. However, this federal district court is one of limited jurisdiction which cannot and should not be invoked to frustrate the proper regulatory purposes of the sovereign State of Georgia. As Justice Bleckley observed in closing an eloquent opinion, "the law cannot prevent injustice in every instance. Would that it could." *Early & Lane v. Oliver & Norton*, 63 Ga. 12, 22 (1879).

Accordingly, defendants' motions to dismiss are GRANTED with respect to all of the plaintiffs' federal claims. Due to the pendent nature of the state law claims, the Court lacks subject matter jurisdiction to consider them.

ORDER ENTERED.