H.J., INC., a Minnesota corporation, Kirk Dahl, Larry Krugen and Mary Krugen, individually and d/b/a Photo Images, Susan Davis, Robert Neal, Isaac H. Ward, Richard L. Anderson, Thomas J. Mott, and all others similarly situated, Plaintiffs,

v.

NORTHWESTERN BELL TELEPHONE COMPANY, a subsidiary of U.S. West, A.B.C. individually and D.E.F. as corporations, and other unnamed Co-conspirators, Defendants.

Civ. No. 4–86–546.

United States District Court,
D. Minnesota,
Fourth Division.

April 4, 1990.

John Cochrane, Cochrane & Bresnahan, St. Paul, and Mark Reinhardt, Susan Bedor, Reinhardt & Anderson, St. Paul, Minn., for plaintiffs.

John D. French, John F. Beukema, James L. Volling, Joseph H. Otterstetter, Faegre & Benson, Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendants' motion to dismiss plaintiffs' RICO claims, defendants' motion for reconsideration and reinstatement of judgment, and plaintiffs' motion for separate trial or severance.

FACTS

Plaintiffs' complaint alleges that beginning on July 1, 1980, defendant Northwestern Bell provided officials of the Minnesota Public Utilities Commission (MPUC) with various "benefits, rewards and considerations" for the purpose of influencing these officials in setting telephone rates of the state of Minnesota. In Count I, plaintiffs allege that such acts constituted bribery within the meaning of Minn.Stat. § 609.42, subd. 1(1), 1(2), and Minnesota common law. Upon these predicate acts of bribery, plaintiffs seek relief pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.*

Plaintiffs' RICO allegations comprise the remaining four counts of the complaint, Counts II–V. Count II alleges that Northwestern Bell received income through its alleged acts of bribery and invested such income in its own operation in violation of 18 U.S.C. § 1962(a). Count III alleges that Northwestern Bell acquired or maintained interest or control of the MPUC through its acts of bribery in violation of 18 U.S.C. § 1962(b). Count IV alleges that Northwestern Bell was associated with the MPUC and conducted and participated in the conduct and affairs of the MPUC through its acts of bribery in violation of 18 U.S.C. § 1962(c). Finally, Count V claims that Northwestern Bell and its employees conspired with MPUC officials to violate RICO, in violation of 18 U.S.C. § 1962(d).

Plaintiffs claim that they were damaged by reason of the above violations in that Northwestern Bell was permitted by the MPUC to charge rates in excess of what would have been determined to be fair and reasonable by the MPUC in the absence of the improper influences. They seek treble damages in accordance with 18 U.S.C. § 1964(c), punitive and exemplary damages, interest, costs and disbursements including attorneys' fees pursuant to 18 U.S.C. § 1964(c), and an injunction barring defendants from engaging in further illegal activity.

## A. *Procedural History*

This action was filed July 8, 1986, and in September 1986 defendant Northwestern Bell moved to dismiss both the bribery count and the RICO claims. By order dated November 24, 1986 the Court dismissed the complaint on three grounds: (1) that the RICO claims failed to allege a sufficient pattern of racketeering activity; (2) that the action was barred by the "filed-rate" doctrine which provides that an administrative agency's rate determination bars collateral attack in a judicial proceeding; and (3) that Count II failed to state a claim because it alleged that Northwestern Bell was both the "person" and the "enterprise" under section 1962(a). *H.J., Inc. v. Northwestern Bell Telephone Co.*, 648 F.Supp. 419 (D.Minn.1986). With the federal claims dismissed, the Court found no "unusual circumstances" warranting the exercise of jurisdiction over plaintiffs' pendent state law claims and those claims were dismissed without prejudice.

By order dated February 18, 1987, the Court denied plaintiffs' motion for reconsideration, further elaborating on its ruling regarding the "pattern" requirement. *H.J., Inc. v. Northwestern Bell Telephone Co.*, 653 F.Supp. 908 (D.Minn.1987). The United States Court of Appeals for the Eighth Circuit affirmed dismissal based on the pattern requirement, but did not address the remaining grounds for dismissal. *H.J., Inc. v. Northwestern Bell Telephone Co.*, 829 F.2d 648 (8th Cir.1987).

On June 26, 1989, —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195, the United States Supreme Court reversed, holding that the court of appeals erred in affirming the district court's dismissal for failure to plead a sufficient pattern of racketeering activity. On remand, the Eighth Circuit noted that rulings other than that reversed by the Supreme Court remained on appeal, but declined to consider them, finding:

> Those issues, notably dismissal of certain pendent state claims, and relatedly questions concerning collateral attack on rate orders by state regulatory bodies, were decided by the district court in light of that court's decision on the civil RICO claims. We observe that on remand the district court will be considering, and indeed possibly reconsidering, its rulings in context of the Supreme Court's opinion. Thus, it is entirely likely that some of the issues originally before both the district court and this court will not survive further proceedings. To say the least, their pursuance will be in different context.

Order or Remand dated October 30, 1989. Accordingly, the Eighth Circuit vacated this Court's order dismissing the complaint for failure to state a claim, and remanded for further proceedings. The court stated that on remand, the district court would be "at liberty to consider or reconsider such of its related and interdependent rulings as are, or may appear to be, appropriate." *Id.*

## B. *The Pending Motions*

Defendants now move the Court to reinstate its former judgment of dismissal based on (1) the filed rate doctrine, and (2) the "person"/"enterprise" pleading defect in Count II. Defendants also raise the following other grounds in support of dismissal: (1) MPUC is not an appropriate "enterprise" under sections 1962(b) and (c); (2) plaintiffs do not allege the requisite "interest in or control of" the MPUC on the part of Northwestern Bell within the meaning of section 1962(b); and (3) Northwestern Bell is not "employed by or associated with" the MPUC within the meaning of section 1962(c); (4) that the complaint fails to allege Northwestern Bell's participation as a "principal" as required by section 1962(a); (5) that plaintiffs failed to allege a "racketeering injury" by reason of defendants' alleged violations of section 1962(a), (b), and (d); and (6) that plaintiffs failed to allege a proper RICO conspiracy pursuant to section 1962(d). Defendants also argue that RICO's pattern requirement is unconstitutionally vague. Finally, defendants argue that Count I of plaintiffs' complaint alleging state law bribery claims should be dismissed with prejudice in light of the rejection of such claims by the Minnesota Court of Appeals in plaintiffs' parallel action, *H.J., Inc. v. Northwestern Bell Telephone Co.*, 420 N.W.2d 673 (Minn.Ct.App. 1988).

For the reasons stated below, defendants' motion to dismiss will be granted.

DISCUSSION

I. The Filed–Rate Doctrine

A. *The Court's Reasoning in 1986*

■ The Court's 1986 dismissal was based on, among other things, the filed-rate doctrine articulated by the United States Supreme Court in *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951). In *Montana–Dakota*, a public utility electric company sought to recover alleged overcharges from a second electric company with whom plaintiff had exchanged electric energy. The electricity exchanges were performed pursuant to inter-company contracts establishing rates and charges which had been filed with and accepted by the Federal Power Commission pursuant to the Federal Power Act. Plaintiff alleged that the rates which were filed and approved were fraudulent and unlawful, being the product of an interlocking directorate. The Court held that the district court was without power to determine what the reasonable rates should have been, and that this was a matter assigned by statute to the Federal Power Commission. *Id.* at 251, 71 S.Ct. at 695. The Court held:

Petitioner cannot separate what Congress has joined together. It cannot litigate in a judicial forum its general right to a reasonable rate, ignoring the qualification that it shall be made specific only by exercise of the Commission's judgment, in which there is some considerable element of discretion. It can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission, and not even a court can authorize commerce in the commodity on other terms.

We hold that the right to a reasonable rate is the right to a rate which the Commission files or fixes, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its

opinion, it is the only or the more reasonable one.

*Id.* at 251–52, 71 S.Ct. at 695.

This Court, in its 1986 opinion, also relied upon *Arkansas–Louisiana Gas Co. v. Hall*, 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). In *Arkansas Gas*, the Court held that a natural gas producer was not entitled to damages from a natural gas purchaser measured by the difference between the rate filed with the Federal Power Commission and a rate which plaintiff alleged was due under a contract with defendant.

Citing *Montana–Dakota*, the Supreme Court reiterated the principle that the authority to decide whether rates were reasonable was vested solely in the Federal Power Commission, and that "no court may substitute its own judgment on reasonableness for the judgment of the Commission." *Id.* at 577, 101 S.Ct. at 2930. The Court noted that the considerations underlying the filed-rate doctrine "are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant." *Id.* at 577–78, 101 S.Ct. at 2930. The Court concluded:

No matter how the ruling of the Louisiana Supreme Court may be characterized, [defendant and the Commission] argue, it amounts to nothing less than the award of a retroactive rate increase based on speculation about what the Commission might have done had it been faced with the facts of this case. This, they contend, is precisely what the filed rate doctrine forbids. We agree. It would undermine the congressional scheme of uniform rate regulation to allow a state court to award as damages a rate never filed with the Commission and thus never found to be reasonable within the meaning of the Act. Following that course would permit state courts to grant regulated sellers greater relief than they could obtain from the Commission itself.

*Id.* at 578–79, 101 S.Ct. at 2931.

In *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 106 S.Ct.

1922, 90 L.Ed.2d 413 (1986), a class of shippers brought suit against motor carriers and the Niagara Frontier Tariff Bureau, Inc., a non-profit corporation organized to engage in collective rate-making activities pursuant to an agreement filed with and approved by the Interstate Commerce Commission (ICC). The complaint alleged that defendants engaged in a conspiracy, in violation of the Sherman Act, to fix rates for transporting freight between the United States and Canada and sought treble damages, measured by the difference between the rates they were required to pay and those which would have prevailed in a freely competitive market. Plaintiffs argued that the conspiracy was not exempted from a treble damages action even though the rates charged had been filed with the ICC. *Id.* 106 S.Ct. at 1925. The Court relied upon *Keogh v. Chicago & N.W. Railway*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) in which the Court barred actions based on federal antitrust laws for illegal price-fixing of utility rates on the grounds that:

> the legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier ... and they are not affected by the tort of a third party.... This stringent rule prevails, because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated.

*Keogh,* 260 U.S. at 163, 43 S.Ct. at 49. The Court in *Square D* declined to overrule *Keogh,* finding that it "represents a long-standing statutory construction that Congress has consistently refused to disturb, even when revisiting the specific area of law." *Square D,* 106 S.Ct. at 1929.

Plaintiffs argue that these cases are not controlling because at issue here is the impact of state rate-making procedures upon a federal cause of action, while *Montana–Dakota* and *Louisiana Gas* concerned federal rate-making procedures and

state law causes of action. Further, the *Keogh* doctrine addresses the impact of federal rate-making procedures on the federal antitrust cause of action, essentially a question of congressional intent. Thus, according to the plaintiffs, the concerns which prompted the Supreme Court to make the rate-making proceedings conclusive in the above cases are not present here.

Defendants respond by relying on principles of federalism and judicial restraint in the administrative sphere, and argue that for these reasons, Congress would not have intended RICO to be used in a way that interfered with state rate-making procedures. These issues were thoroughly explored in two recent cases involving RICO claims against state-regulated utilities: *Carr v. The Southern Co.,* 731 F.Supp. 1067 (S.D.Ga.1990) and *County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1387 (E.D.N.Y.1989). In *Long Island Lighting,* a county brought suit against the utility and its former managers under RICO claiming that defendants lied to the New York Public Service Commission (PSC) in order to obtain higher electric rates. Judge Weinstein noted that prior to trial the court had been of the view that the federal RICO statute took precedence over state rate-regulating policy. 710 F.Supp. at 1393. The court concluded after trial, however, that a jury should not be allowed to second-guess the rate-making authority of the state in a RICO trial. *Id.* at 1393. The court relied upon the doctrine of primary jurisdiction by which courts "stay or dismiss court proceedings pending resolution by the administrative agency of the issues within the latter's special competence." *Id.* at 1395, *citing United States v. Western Pacific Railway,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–65, 1 L.Ed.2d 126 (1956). The court held that the doctrine of primary jurisdiction suggested that RICO was an inappropriate mechanism for challenging the state regulated utility rates. The court concluded that primary jurisdiction barred an action even when the alleged excessive rates were the result of misrepresentations to the administrative agency.

*Id.* at 1396. The court rejected the argument that the primary jurisdiction doctrine did not apply where a federal statute and a state administrative proceeding were involved:

> [T]here is no reason to believe that allowing the PSC to set state electric rates and to exercise its own powers to roll back rates where it has been misled will frustrate RICO policy.

*Id.* at 1396. The court cited a number of cases in which federal courts have applied the doctrine where the claim is brought under federal antitrust law and the regulatory agency whose actions are in dispute is a state body. *See, e.g., Huron Valley Hospital v. City of Pontiac,* 666 F.2d 1029 (6th Cir.1981). The court also relied upon the doctrine of *Burford* abstention, federalism concerns underlying the tenth amendment, and the "clear statement" doctrine.[1]

In *Carr* a class of electric power customers brought suit against electric utilities alleging that the utilities fraudulently employed accounting methods which inflated maintenance costs submitted to the Public Service Commission (PSC), and thereby obtained improper rate increases from the PSC. Plaintiffs based their claim under RICO, as well as the Sherman Anti–Trust Act, the Public Utility Holding Company Act, the Federal Power Act, and pendent state law causes of action. Citing the *Long Island Lighting* case in detail, the court held that the primary jurisdiction doctrine mandates that an agency, rather than a court, handle issues regarding special expertise, and that since plaintiff's case would necessarily involve the court in judicial rate-making, the primary jurisdiction doctrine barred all of plaintiff's federal claims. The court also relied on the doctrine of *Burford* abstention, concluding that the relief requested would require the court to delve into questions concerning local regulatory facts and problems, and further that the clear statement doctrine prevents intrusion of federal statutes into

areas of traditional state concern unless Congress clearly indicates otherwise.

Judge Weinstein's thorough analysis, followed by the court in *Carr,* provides additional support for the Court's 1986 ruling that the Court is barred from entertaining an action which would second-guess the MPUC's rate-making decisions.

### B. *Impact of the MPUC's Rate Reconsideration*

Plaintiffs argue that the rationale underlying this Court's 1986 decision no longer applies because of the MPUC's decision to reopen certain of the rates charged by Northwestern Bell in light of the bribery allegations. On July 9, 1986, the Minnesota Attorney General petitioned the MPUC to reopen and reconsider docket 600, the proceedings on the rate increase requested by Northwestern Bell in 1983 which culminated in a rate increase on September 26, 1984 of $57,148,000. The Attorney General's request was based on an MPUC internal investigation, referred to as docket 177, concerning alleged improper contacts between former MPUC commissioners Leo Adams and Roger Hanson, and Northwestern Bell representative Roy Weir, during the pendency of docket 600. The commission approved the Attorney General's petition, and on April 2, 1987, the commission issued a final order vacating the 1984 rate order and reopening that order for further deliberation. *See Matter of Minnesota Public Utilities Commission,* 417 N.W.2d 274, 276–78 (Minn.Ct.App.1987), *review denied, cert. denied, Northwestern Bell Telephone Co. v. MPUC,* —— U.S. ——, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988). As a result of this reconsideration, the commission issued a prospective rate decrease from $57,148,000 to $45,603,000. On appeal, the Minnesota Court of Appeals held that the commission could properly reopen and vacate its 1984 rate order based upon a theory of "fraud on the tribunal." *Id.* at

---

1. The court also cited the Johnson Act, 28 U.S.C. § 1342, which bars federal courts from "interfering" with state orders regarding utility rates in actions based on diversity of citizenship or constitutionality. The Act, while not applying by its terms to a RICO action, supplies additional evidence, according to the court, that rate-making functions are not to be disturbed by federal courts. *Id.* at 1398.

282. According to the court, the commission determined that the num and timing of the ex parte contacts between Northwestern Bell and commissioners Hanson and Adams sustained the inference that Northwestern Bell's actions were intended to influence the commission's decision in docket 600. *Id.* The court concluded that:

> The record supports the Commission's determination. During the time the Commission was deliberating on Northwestern Bell's petition for a rate increase, numerous meeting were held between Weir and Commissioners Adams and Hanson. Those meetings were all paid for by Northwestern Bell. The dates upon which Weir paid for meals for Commissioners Hanson and Adams occurred during the time docket 600 was pending before the Commission. The evidence is more than sufficient to sustain the Commission's inference that Northwestern Bell's actions were intended to influence the commission and therefore constituted a fraud on the commission.

*Id.* The court further found that the record supported the conclusion that the improper contacts actually affected the commission's final rate decision. The court quoted the following statement from a similar case involving a different utility, *In re Northern States Power Co.*, 414 N.W.2d 383, 386–87 (Minn.1987):

> While the record contains no direct evidence that Adams unduly influenced the decision, his mere presence creates the obvious appearance of impropriety and undermines the public confidence in the system. We are incredulous that these sophisticated governmental and utility officials could have assumed otherwise. We therefore hold that there is substantial evidentiary support for the findings of the Commission that the individuals had a duty to disclose their association, that Adams had a substantial conflict of interest, and that the proceedings were tainted as a result.

417 N.W.2d at 283. The court further noted that at the time of Northwestern Bell's initial request for a rate increase the administrative law judge (ALJ), who had been uninfluenced by the ex parte communica-tions, recommended only a $36.1 million rate increase, while the allegedly tainted commission voted to grant a rate increase in the amount of $57,511,000. "This discrepancy," according to the court, "provides further support for the Commission's subsequent determination that the proceedings in docket 600 were tainted by the ex parte contacts." *Id.* at 283.

The results of the MPUC's redeliberation were issued by orders dated April 3, 1987 and April 4, 1987. *See* Defendants' Memorandum in Support of Motion for Reconsideration and Reinstatement of Judgment, Exh. A, D. In its April 3, 1987 order, the commission discussed the appropriate remedy for the improper contacts. It decided not to retroactively dismiss the rate increase application in its entirety, as had been requested by the Minnesota Public Interest Research Group (MPIRG). Rather, the commission ordered the matter redeliberated. Following redeliberation, the commission determined that Northwestern Bell had "overcharged its customers since interim rates were put into effect on November 28, 1983," and that "overcharges should be refunded to rate-payers." *In the Matter of the Application of Northwestern Bell Telephone Co.*, Order After Redeliberation dated April 3, 1987 at 137, Defendants' Memorandum in Support of Motion for Reconsideration and Reinstatement of Judgment, Exh. B at 137. The commission concluded, however, that it lacked authority to order refunds, pursuant to the Minnesota Supreme Court's decision in *In re Peoples Natural Gas Co.*, 369 N.W.2d 530 (Minn.1985). The commission recognized that the court had authorized the Attorney General to pursue such refunds under Minn.Stat. § 216B.54. *See State by Spannaus v. Northwestern Bell Telephone Co.*, 304 N.W.2d 872 (Minn.1981). Accordingly, the commission ordered prospective rate decreases but requested the Attorney General to pursue the remedy of refunds for past overcharging.

In response to MPUC's request, the State of Minnesota brought suit against Northwestern Bell in Hennepin County District Court to collect refund amounts in

accordance with the 1987 MPUC reconsideration. *State of Minnesota v. Northwestern Bell Telephone Co.*, CIVIL C8–87–487340 (Ramsey County District Court). That case was settled by the parties on September 28, 1989 and provided for a refund of $31,900,000 plus interest and applicable taxes. Settlement Agreement at Defendants' Exh. C. This figure was determined based on the difference between the tariffs originally approved by the MPUC and those determined after reconsideration in the 1987 orders.

Plaintiffs argue that because the MPUC has reconsidered the rates allegedly tainted by defendants' improper contacts and determined the amount of overcharging caused thereby, there is no reason for the Court to abstain. The Court disagrees. The purposes underlying the abstention and clear statement doctrines go beyond the avoidance of judicial rate-making. At their core, these doctrines are concerned with preservation of the federal balance, and deference to the legitimate police powers of the states. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (abstention appropriate where "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern"); *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971) (statutes not construed to alter federal-state balance unless intent to do so "clearly stated"). Here, an award of treble damages against a regulated public utility such as Northwestern Bell adds a severe sanction for the conduct in question for which the defendants would not otherwise be liable under state laws governing rate making. There is no indication that in redetermining suitable rates for Northwestern Bell the MPUC considered the possibility of an award of treble damages against the company under RICO for overcharging. The availability of such a remedy could well impact the manner in which a regulatory body such as the MPUC conducts rate making procedures and investigates and

amends its decisions when it finds that errors may have been made in rate-setting determinations.

In plaintiffs' parallel state court action, *H.J., Inc.*, 420 N.W.2d 673 (Minn.Ct.App. 1988), the Minnesota Court of Appeals held that plaintiffs' state law unjust enrichment claims constituted a collateral attack on the MPUC's rate making decisions in violation of Minn.Stat. 237.26 which provides:

> If no appeal is taken from any order of the department ... then in all litigation thereafter arising between ... private parties and any telephone company, the order shall be deemed final and conclusive.

The court rejected the argument that plaintiffs' claim was not a collateral attack on a rate order because it merely sought to declare the rates void and not to reset rates. The court held that the statute does not distinguish between collateral attacks based on the reasonableness of rates and collateral attacks based on the validity of the rate proceeding, and concluded that plaintiffs' claim "would still be a collateral attack on a rate order in violation of Minn. Stat. § 237.26." 420 N.W.2d at 676. This decision was reached almost a year after the MPUC reconsideration order. Thus the court was presumably aware that the MPUC had itself reconsidered the rates when it held that plaintiffs' claims constituted a collateral attack on the original rates. It is apparent, therefore, that Minn. Stat. § 237.26, as interpreted by the Minnesota Court of Appeals, supports the view that plaintiffs' RICO claims, like their unjust enrichment claims, constitute a collateral attack on state rate-making determinations and should be barred.

In *Long Island Lighting*, the court held that abstention was appropriate regarding RICO claims challenging electric rates determined by the New York Public Service Commission:

> Exercise of RICO jurisdiction in this case "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern".... State regulation of utilities is a matter of "substantial public concern."

*Long Island Lighting*, 710 F.Supp. at 1398, *quoting Colorado River Water Conservation District v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (describing circumstances under which abstention is appropriate). As the Supreme Court held in *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission*, 461 U.S. 375, 103 S.Ct. 1905, 1908, 76 L.Ed.2d 1 (1983), "the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States."

In *Long Island Lighting*, the court also relied upon the doctrine of "clear statement," pursuant to which legislation will not be interpreted to alter the federal-state balance absent a "clear statement that Congress intended to exercise its ... power in full." 710 F.Supp. at 1400, *citing* L.H. Tribe, *American Constitutional Law* 316 (2d ed.1988). For example, in construing the federal mail fraud statute not to reach schemes to defraud people of intangible rights to honest government, the United States Supreme Court recently held:

> Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the federal government in setting standards of disclosure and good government for local and state officials, we read section 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has.

*McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987). In *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), in construing the Omnibus Crime Control and Safe Streets Act to require a nexus with interstate commerce, the Court held:

> [U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal state balance.... [W]e will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.

*Id.* at 349, 92 S.Ct. at 523.

In light of these principles, the court in *Long Island Lighting* declined to construe RICO to reach claims against state regulated utilities.

> [T]o apply [RICO] to the facts of the present case would ... lead to ... the intrusion of federal authority into an area historically reserved to state control. In such a situation the "clear statement" doctrine and the federalism concerns that underlie it are properly invoked.

*Long Island Lighting*, 710 F.Supp. at 1403. The court in *Carr* echoed this conclusion:

> [P]laintiffs contend that the expanded jurisdiction of the federal civil RICO statute enables this court to make reparations for the alleged commission of fraud in the instant case.... I cannot find that the RICO statute authorizes such a drastic intervention into a state's authority to regulate public utilities.

*Carr*, 731 F.Supp. 1067.[2]

As discussed above, this case treads heavily in an area of fundamental state

---

**2.** Plaintiffs rely on *Clipper Exxpress v. Rocky Mountain Motor Tariff*, 690 F.2d 1240 (9th Cir. 1982), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1985) in which the United States Court of Appeals for the Ninth Circuit held that a freight forwarder regulated by the Interstate Commerce Commission may bring a claim for damages against trucking companies and a rate bureau for alleged antitrust violations, in which plaintiff claimed that defendants' actions delayed plaintiff's filing of a rate for two years, a rate which the ICC ultimately approved. The Court concluded that the *Keogh* doctrine was not violated because relief would do nothing to disturb ICC approved rates, and would not involve speculation about what rates the ICC would have approved but for defendants' conduct, the primary issue in *Keogh*. In the court's view, however, this case is distinguishable in that the Sherman Act is a specific legislative attempt to discourage and eliminate restraints of trade, while RICO lacks the same clear focus. In light of what the Court perceives as a serious disruption of state regulatory

888

concern, public utility regulation. The MPUC employed its administrative expertise and procedural decision making apparatus to uncover the wrongdoing on the part of Northwestern Bell. This administrative action resulted in both rate adjustments, and an agreement refunding to Northwestern Bell customers $31.9 million plus interest and applicable taxes. For the reasons discussed above, the Court is satisfied that Congress did not intend that the additional sanction of treble damages should be available against defendants under RICO for the actions alleged in plaintiffs' complaint. Accordingly, defendants' motion to dismiss plaintiffs' RICO claims will be granted.[3]

## II. Whether Count I of Plaintiffs' Complaint Alleging Pendent State Law Claims Should be Dismissed

Count I of plaintiffs' complaint alleges that defendant violated the Minnesota bribery statute, Minn.Stat. § 609.42, as well as Minnesota common law, and seek damages on account of these violations. In 1986 the Court declined to exercise jurisdiction over these claims in light of its dismissal of plaintiffs' RICO claims. *H.J., Inc.*, 648 F.Supp. at 429–30. Defendants now seek dismissal with prejudice in light of the Minnesota Court of Appeals' rejection of such claims in plaintiffs' concurrent state court action. Plaintiffs seek severance of such claims, and argues that the Court need not reach this issue unless the federal claims are dismissed.

In *H.J., Inc. v. Northwestern Bell Telephone Co.*, 420 N.W.2d 673 (Minn.Ct.

App.1988), the Minnesota Court of Appeals sustained the trial court's dismissal of plaintiffs' concurrent state court suit. The court held that neither the Minnesota bribery statute nor Minnesota common law provided a private cause of action for damages. Defendants argue that this judgment precludes further litigation of this issue by plaintiffs in this Court. Defendants are correct. The final judgment on the merits of an action precludes the parties from relitigating issues that were or could have been tried in that action. *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981). These claims will therefore be dismissed on the merits. Dismissal of plaintiffs' state law claims on the merits renders moot plaintiffs' motion for severance or for separate trial.

Accordingly, based on all the files, records and proceedings herein,

IT IS ORDERED that

1. defendants' motion to dismiss plaintiffs' RICO claims is granted;

2. defendants' motion to dismiss plaintiffs' state law claims is granted; and

3. plaintiffs' complaint is dismissed with prejudice.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

policy, the Court declines to find that RICO was intended to apply to the claims at issue in this case.

**3.** In light of the Court's disposition of this case, the Court need not reach the numerous issues of RICO construction raised by defendants in support of their motion to dismiss. Nor need the Court address the important and intriguing question of the constitutionality of RICO. *See H.J., Inc.*, 109 S.Ct. at 2909 (Scalia, J., concurring).

The Court does note, however, what appears to be a significant development among the United States courts of appeals regarding the person-enterprise distinction under 18 U.S.C. § 1962(a).

In 1986 the Court held that plaintiff must allege "person" distinct from the RICO "enterprise" under section 1962(a). Since that time several circuits have held otherwise. *See Schreiber Distributing Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1397 (9th Cir.1986); *Garbade v. Great Divide Mining*, 831 F.2d 212, 213 (10th Cir.1987); *Yellow Bus Lines, Inc. v. Local Union 639*, 839 F.2d 782, 790 (D.C.Cir.1988), *vacated on other grounds*, —— U.S. ——, 109 S.Ct. 3235, 106 L.Ed.2d 583 (1989); *Official Publications, Inc. v. Kable News Co.*, 884 F.2d 664, 668 (2d Cir.1989). The Fourth Circuit has reversed its previous position. *See Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir.1990).